[Crim. No. 4158.   In Bank.—June 22, 1939.]

THE PEOPLE, Appellant, v. NOEL DAVENPORT, Respondent.

U. S. Webb, Attorney-General, Earl Warren, Attorney-General, Walter L. Bowers, Deputy Attorney-General, Buron Fitts, District Attorney (Los Angeles County), and A. H. Van Cott, Deputy District Attorney, for Appellant.

Edwin M. Daugherty, Commissioner of Corporations, and Fred A. Weller, Chief Assistant Commissioner of Corporations, as *Amici Curiae,* on Behalf of Appellant.

Morris Lavine for Respondent.

THE COURT.—This is an appeal by the People from a judgment sustaining a demurrer to eighteen counts of an amended indictment, in each of which defendant was charged with a violation of the Corporate Securities Act.

By the indictment defendant was accused of issuing and selling securities in the form of a series of agreements, the first of which was dated October 23, 1933, and the last, April 10, 1934. Except for names, dates and amounts, the various counts were practically identical and only one need be described here. In the first count it was charged that "The said Noel Davenport, on or about the 23rd day of October, 1933, at and in the County of Los Angeles, State of California, did wilfully, unlawfully, feloniously and knowingly authorize, direct and aid in the issuance and sale of, and did issue, execute and sell, and assist in causing to be issued, executed and sold to Ella J. Bloom for value, a security of his own issue, to-wit, an evidence of indebtedness, note and investment contract, said security not being one issued, given or acquired in a *bona fide* way in the ordinary course of legitimate business, trade or commerce, and said security being one issued for sale to the public by the said Noel Davenport, the said Noel Davenport not having first applied for and secured a permit from the Commissioner of Corporations of the State of California so to do; the said security being in

words and figures as follows, to-wit: . . . " There follows a copy of an "agreement" signed by the respondent as first party and by Ella J. Bloom as second party. That agreement contained the following:

"DECLARATION OF FIRST PARTY. That he now is and for some considerable time heretofore has been engaged in the business of buying and selling gold and silver bullion, maintaining a principal place for the transaction of said business at Nogales, Arizona, in the conduct of which he has contracted to purchase the gold and silver production from a number of mining properties now in actual operation in the Altar Mining District of Mexico.

"That to avail himself of the increased production of said bullion additional capital is required to finance his operations, which will be used only in the business of merchandising gold and silver bullion and for no other purpose whatsoever.

"That his present and past experience leads him to believe that the continuance of this business will be profitable and his experience has been that a profit of not less than fifty (50%) per cent can be realized upon shipments of bullion as they are made from time to time.

"That he is thoroughly conversant with the character of business in which he is now engaged and conducts said business on his own individual responsibility, and that he believes that he is established in a way that he can continue to operate successfully in the future.

"DECLARATION OF SECOND PARTY. That he has read the above and foregoing statement and that First Party has made no representations other than therein contained to induce him to execute this agreement and that he does so freely and voluntarily, on his own initiative and responsibility without any promise, agreement, representation, or inducement except as herein contained, and with no hope of profit or reward other than the payment of the purchase price herein stipulated.

"That said sale is made without any restriction or limitation with the understanding that First Party may use and dispose of said securities as the absolute owner thereof and that his agreement to pay therefor as herein provided is the sole and only consideration therefor, and that the only obligation of First Party is the debt evidenced hereby.

"That he has made no representation as to the value of said securities and that the selling price therefor is fixed and

determined without reference to the present market value and that any difference between the selling price as fixed hereby and the market value shall not be a defense available to First Party either on the ground of usury or otherwise.

"BY REASON WHEREOF, the said Parties do hereby agree as follows: . . . "

Thereafter, the agreement contained provisions by which the first party agreed to buy, and the second party agreed to sell to him, for $795.47, certain building and loan certificates, for which the first party agreed to pay in twenty-five equal monthly instalments, with interest on deferred payments at seven per cent per annum, payable quarterly, and the first party acknowledged receipt of the certificates, the said certificates bearing "the proper endorsement thereon transferring title to First Party". The agreement also provided that the payments thereon would be made at a certain bank; that as collateral security the first party would insure his life, naming the bank as beneficiary and providing that in the event of his death the proceeds would be applied upon any amount due to the second party; that if four consecutive instalments were not paid the whole amount might be declared due; and that "This instrument is non-negotiable and shall not be assigned by either party without the written consent of the other".

The determinative question presented by the appeal is whether the transactions had between the respondent and others named in the various counts of the indictment in fact amount to sales of "securities" within the meaning of the Corporate Securities Act.

The appellant contends that the transactions here involved were "investment" contracts or "evidences of indebtedness" within the meaning of the Corporate Securities Act. On the other hand, the respondent contends that each agreement pleaded is merely one for the purchase and sale of personal property, and not a "security" as defined in the act.

Although it is obviously true that the usual contract for the purchase and sale of property in the ordinary course of business is not within the purview of the Corporate Securities Act, nevertheless the mere fact that a transaction is clothed in the language and form of such a purchase and sale contract is not in itself a conclusive badge of its innocence. In proper circumstances "courts have looked through form to substance and found that in fact the transaction *contem-*

*plated the conduct of a business enterprise by others than the purchasers, in the profits or proceeds of which the purchasers were to share".* (Emphasis added.) (*Domestic & Foreign Pet. Co., Ltd.,* v. *Long,* 4 Cal. (2d) 547 [51 Pac. (2d) 73].) It may be conceded that, in some circumstances, judicial tribunals have concluded that a contract, or even a deed, regular upon its face, has been found to constitute a ''security'' as that word was intended to be used in relation to the act, and within the scope and purpose of the legislation.

In the instant case, the defendant was charged in each count of the indictment with having sold a ''security'', which amounted to, or was in the nature of, an ''evidence of indebtedness'', a ''note'', or an ''investment'' contract. The provisions of section 2 (a), subdivision 7, of the act (Stats. 1933, p. 2308) which were in effect at the time of the transactions here involved, and upon which the indictment was based, provided that a ''security'' was to include ''any stock, bond, note, treasury stock, debenture, evidence of indebtedness, certificate of interest or participation, certificate of interest in a *profit-sharing* agreement, . . . investment contract, or beneficial interest in title to property, *profits* or *earnings,* . . . '' (Emphasis added.) But under section 2 (b), subdivisions 10 and 11 thereof, the following exceptions were made: ''bills of exchange, trade acceptances, promissory notes and other commercial paper issued, given or acquired in a *bona fide* way in the ordinary course of legitimate business, trade or commerce. *Promissory notes,* whether secured or unsecured, where the notes are not offered to the public, . . . '' (Emphasis added.)

In construing the provisions of section 2(a), subdivision 7, which provide that ''The word 'security' shall include . . . any note, . . . evidence of indebtedness, . . . investment contract . . . '', etc.,—in the light of the rules relating to the construction of statutes, which provide that words of general import may be given a contracted meaning dependent upon the connection in which they are employed, and considering the general purpose or scheme entertained by the legislature in passing the statute, and the rule that words will not be given their literal meaning when to do so would evidently carry the operation of the enactment far beyond the legislative intent and thereby make its provisions apply to transactions never contemplated by the legislative body

(*Lewis* v. *Creasey Corp.*, 198 Ky. 409 [248 S. W. 1046]),—it is clear that the legislature intended by the use of the words or phrases of general import in said section, such as "note" and "evidence of indebtedness", that each such expression should possess the same general characteristics as the word "security", within the meaning of which the legislature provided that they were to be included. Furthermore, since, for example, the legislature specifically excepted from the operation of the act "promissory notes", falling within the provisions of section 2 (b), subdivisions 10 and 11, hereinbefore referred to, it plainly was not the legislative intent that "*every*" note or evidence of indebtedness, regardless of its nature and of the circumstances surrounding its execution, should be considered as included within the meaning and purpose of the act.

However, the appellant earnestly contends that the "agreement" here in question at least amounted to an "investment" contract. But it has been judicially declared (*People* v. *Davenport,* 21 Cal. App. (2d) 292 [69 Pac. (2d) 861] ; *Lewis* v. *Creasey Corp.,* 198 Ky. 409 [248 S. W. 1046] ), that in the generic sense of the word every contract is an "investment" contract,—from which declaration it should follow that, when viewed in the light of the surrounding circumstances, the question whether the contract in the instant case is included within the purview of the act would seem necessarily to depend upon the construction which appellate courts of this and other jurisdictions, respectively, have placed upon the several Corporate Securities Acts of the various states, including the construction which those tribunals have placed upon the pertinent terms therein employed, such as "security", "investment" contract, and the like.

In 37 Corpus Juris, at page 275, it is said: "The term 'securities' as used in these [Blue Sky] laws, means written assurances for the return or payment of money, evidences of indebtedness, except where special definitions are given by the statutes. Thus under some statutes, it includes any certificate or instrument issued and sold or offered to the public, evidencing *a right to participate in the profits or earnings or the distributions of the assets* of a business carried on for profit, or the shares or other interests or right into which the property of companies or rights of members thereof are divided, and all certificates and other instruments issued by

them or under their authority evidencing or representing such shares, interests, or rights. It means the investment of funds *in a designated portion of the assets and capital of a concern, with a view of receiving a profit through the efforts of others than the investor;* and in this sense includes what are termed 'security' or 'investment' contracts or 'speculative securities'. But it does not extend to ordinary commercial contracts, *nor does it include interest income from the lending of money,* or the profits which one might make by his own efforts as the result of any ordinary commercial contract." (Emphasis added.)

In the case entitled *Creasey Corp.* v. *Enz Bros. Co.,* 177 Wis. 49 [187 N. W. 666], wherein the Wisconsin act, analogous to the one involved here was under discussion, the court pointed out that the act read as follows: " ' "Security" or "securities" means and includes any bonds, stocks, notes or other obligations or evidences of indebtedness or of title which constitutes evidences of, or is secured by, title to, interest in or lien upon any or all of the property or *profits* of such company.' " It was there contended that a contract of membership in an association, which gave the member the right to purchase goods from the association at a small stipulated percentage above cost, *but which gave no other interest* to the member in the association, was an obligation for the sale of which a permit was required under the Blue Sky Law, and that the contract in question was included within the term "or other obligations" mentioned in the statute. In *negativing* this contention the court directed attention to the fact that *"The member acquired no rights either in the capital or profits of the company",* and said that "It may be argued that in one sense every contract is a security, because it guarantees to the parties thereto something of value. But, as before stated, the Blue Sky Law . . . was enacted for the purpose of protecting against the sale of worthless money obligations, and *not* against entering into *other* contracts where *service* is to be rendered, as here, or other obligations are incurred that do not partake of the sale of securities, *or of a sharing in either the capital or profits of a company."* (Emphasis added.)

And in the case entitled *In re Waldstein,* 160 Misc. 763 [291 N. Y. Supp. 697], in defining the term "security" the court said, "The term 'security' has no exactly defined legal

definition. Generically, the word has reference to written instruments, usually for the payment of money or evidences of a debt, and being more than a mere promise of the debtor of a general liability on his part, but having as collateral to it a pledge of property or some additional obligation. . . . Those instruments, however, secured or unsecured, which are used for the purpose of financing enterprises and promoting a distribution of rights in or obligations of such enterprises, and which are designed as a means of investment, are termed securities.''

In the case entitled *Lewis* v. *Creasey Corp.*, 198 Ky. 409 [248 S. W. 1046], the corporation operated wholesale grocery houses in the different states of the Union. It sold ''service contracts'' to retail dealers, for which it charged $300 and upon payment of such sum obligated itself to the purchaser of the contract to furnish him with groceries for his store for the period of twenty years at a five per cent increase of the original costs to the Creasey Corporation. The latter contended that the contract did not fall within the provisions of the act (The Kentucky Blue Sky Law) there involved. The act provided that every person who sold ''any contract, stock, bonds or other securities issued by him'' was required to obtain a permit for such sale. In construing that language, the court adverted to the fact that in other sections of the act following the one under review, the transactions covered by the statute were referred to as ''securities'' or as ''other securities'', and said, '' . . . it is made perfectly plain to our minds from a consideration of the whole statute that the character of transactions that the Legislature had in mind, and to which it made its terms applicable, are what is ordinarily understood by the terms 'security contract' or 'securities', and that it never contemplated lodging the power or jurisdiction in the hands of the administrator of the statute to supervise or in any wise regulate all, or any, ordinary commercial contracts between members of society. No such universal guardianship was ever intended (if indeed such a sweeping regulation would be constitutional), howsoever much it might be beneficial in some instances. . . . '' The court there proceeded to say, ''Other authorities give a similar definition to the term, and *it necessarily means the investment of funds in a designated portion of the assets or capital of a*

*concern, with the view that the latter by using, and operating with, the investment will earn a profit for the investor. . . .* but its definition *does not include interest income from the lending of money,* or the profits which one might make by his own efforts as the result of any ordinary commercial contract which he might enter into. . . . We, therefore, conclude as the cases referred to hold, that the primary purpose of Blue Sky Laws is to protect investors from investments in securities whereby *a profit is promised* and expected without any active efforts on the part of the investor, and which scheme contemplates that the company or individual who receives the investment will employ it himself or itself in such a manner *as to reap a profit to the holder of the sold security;* and that it *was not* intended to apply to contracts containing mutual obligations, such as are daily entered into in commercial life, and *from which a profit can only be reaped by the uses which the investor alone makes of them.* In one sense of the word every contract is an investment by the parties thereto. . . . Surely, it cannot be said that the Legislature intended to vest the Banking Commissioner with supervision of all sorts of contracts, though involving the idea of investment, as we have seen, and with power to withdraw the right to make contracts if, perchance, he concluded that one or the other party had been defrauded or that the particular class of contracts possessed the potentialities for the commission of fraud." (Emphasis added.)

In the case entitled *Domestic & Foreign Pet. Co., Ltd.,* v. *Long,* 4 Cal. (2d) 547 [51 Pac. (2d) 73], the same general principles enunciated in the foregoing cases were expressed by this court. Therein lessees under an oil and gas lease made assignments of percentages of oil and other substances to be produced during the lease; but it was not therein contemplated that the lessees and the assignees of such percentages of oil would be tenants in common in the rights conferred by the lease, nor that the assignees would be permitted to drill for or to produce oil, nor that they would have any voice in the operations. In holding that such assignments were "securities" within the meaning of the act, this court said: "Instruments such as those in . . . the instant case are not issued to persons who expect to reap a profit from their own services and efforts exerted in the management and

operation of oil-bearing property, but to those in the category of investors, who, for a consideration paid, stipulate for a right to *share in the profits* or proceeds of a business enterprise or venture to be conducted by others. . . . In decisions in this state and in other jurisdictions where it has been contended that a transaction under attack did not come within the Corporate Securities Act because it constituted only a sale of specific real or personal property or an interest therein, the courts have looked through form to substance and found that in fact the transaction contemplated the conduct of a business enterprise by others than the purchasers, *in the profits* or proceeds of which the purchasers were to share." The court went on to say that "such interests are generally declared to be investment contracts, which are included in the definition of 'security' in the Blue Sky Law of this and other states, . . . " (Emphasis added.)

The foregoing authorities serve to point the distinction between those transactions contemplated by the act, and the contract involved in the instant case, where the only (asserted) *"profit"* contemplated by the alleged purchaser of the "security" *was seven per cent interest on deferred payments of the purchase price.* All he had a right to expect by the transaction *was the payment of the agreed purchase price at the times stipulated,* plus the *interest* therein provided for. And as shown by the authorities herein cited, the expectation of the mere payment of *interest* does not transform the transaction into an "investment" contract within the meaning of the act. (*Lewis* v. *Creasey Corp.,* 198 Ky. 409 [248 S. W. 1046]; *State* v. *Whiteaker,* 118 Or. 656 [247 Pac. 1077]; 37 C. J. 275.) Nor was the seller of the certificate (the alleged purchaser of the "security") *given any interest in any portion of the business.* Under the terms of the contract *he had a right to be paid whether the business prospered or not,* and, in the event of respondent's death, was even protected in the matter of payment by life insurance. Under those circumstances, the use which the respondent may have intended to make of the certificates, or their monetary value, would seem to be immaterial.

It follows from the foregoing discussion that, "looking through form to substance", the instant transactions were

not of that character which the legislature intended should fall within the inhibitions of the act.

The judgment is affirmed.

Rehearing denied. Curtis, J., and Shenk, J., voted for a rehearing.