[Crim. No. 6250. Second Dist., Div. Two. Aug. 18, 1958.]

THE PEOPLE, Respondent, v. HOMER C. MILLS, Appellant.

Homer C. Mills, in pro. per., for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

ASHBURN, J.—Defendant appeals from a judgment entered pursuant to his conviction of violation of two counts of the Corporate Securities Act (Corp. Code, § 26104, subd. (a)).[1] The charges were that (1) on August 1, 1957, he sold and offered for sale to Robert H. Meng and Edwin A. Shrader 200,000 shares of stock in Clark Uranium and Copper Company, a Nevada corporation, without having a permit from the Commissioner of Corporations so to do, and (2) that on said date he offered to sell to said persons certificates of interest in a mining title and lease without having a permit from the Commissioner of Corporations. Defendant was also charged with two prior convictions of felony, one of which was violation of said section 26104, subdivision (a), Corporations Code. At the beginning of the trial said felony convictions were admitted. Defendant was sentenced on each count for the term prescribed by law, said sentences to run concurrently with each other and with the sentence in superior court case Number 172196, which is the case reviewed and affirmed in *People* v. *Mills*, 148 Cal.App.2d 392 [306 P.2d 1005]. Defendant also appeals from an order denying his motion for new trial.

Appellant's major contention is that there was no "security" involved in his transaction with Meng and Shrader

---

[1]Corp. Code § 26104: "Every officer, agent or employee of any company and every other person, who does any of the following acts is guilty of a public offense . . . : (a) Knowingly authorizes, directs, or aids in the issue or sale of, or issues or executes, or sells, or causes or assists in causing to be issued, executed, or sold, any security, in nonconformity with a permit of the commissioner then in effect authorizing such issue, or contrary to the provisions of this division, or of the Constitution of this State."

Corp. Code § 25009: "(a) 'Sale' or 'sell' includes every disposition, or attempt to dispose, of a security or interest in a security for value.

"'Sale' or 'sell' includes all of the following, whether done directly or by an agent, circular letter, advertisement, or otherwise: An offer to sell; an attempt to sell; a solicitation of a sale; an option of sale; a contract of sale; a taking of a subscription; an exchange; any change in the rights, preferences, privileges, or restrictions on outstanding securities."

because they were to become members of a four-member board of directors of the corporation, Clark Uranium & Copper Company, and were to be vice-president and treasurer of the corporation, respectively, and one of them was to cosign all checks with defendant Mills acting as president. Invoking *People* v. *Staver*, 115 Cal.App.2d 711 [252 P.2d 700], and *People* v. *Jaques*, 137 Cal.App.2d 823 [291 P.2d 124], appellant argues that any profit upon their investment could be reaped only through personal efforts of Meng and Shrader and hence the rule of cases such as *People* v. *Syde*, 37 Cal.2d 765, 768 [235 P.2d 601], *People* v. *Gould*, 37 Cal.2d 885 [235 P.2d 604], and *Austin* v. *Hallmark Oil Co.*, 21 Cal.2d 718, 727 [134 P.2d 777], becomes applicable and controlling. In the Austin case the court said, at page 727 : "If the transaction is one in which the assignee is merely an investor who for a consideration is given the right to share in the profits or proceeds of an enterprise to be conducted by others, the instrument representing such interest is a security. Where, however, as in the present case, the assignee is to share in the conduct of the enterprise, the instrument representing an assignment of a fractional interest in the production of oil is not a security within the act."

The facts impliedly found by the jury do not bring this case within the aegis of the cited authorities. ■ In examining the sufficiency of the evidence at bar we must "assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict." (*People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778].) Hence the following résumé of the facts is based primarily upon evidence favorable to the prosecution and made in the light of the impeachment of defendant's testimony growing out of his previous conviction of two felonies, which testimony presumptively was rejected by the jury and trial judge.

Mills, a disbarred lawyer (*Mills* v. *State Bar*, 6 Cal.2d 565 [58 P.2d 1273] ) who refers to himself as a retired lawyer with wide experience in mining matters and many years of familiarity with the Corporate Securities Law of California, inserted in the Los Angeles Times of July 21, 1957, an advertisement reading: "ASSOC. wanted for gold prospect. So. Cal. Good roads, rich ore. Box D-65, Times." Meng and Shrader were investigators on the staff of the district attorney; their superior officer, Lieutenant Morse, called Meng's attention to

the advertisement and gave him certain instructions; Meng on July 22nd wrote to "Box D-65" stating that he was interested in the ad, that his funds were limited but if the property sounded good he was in position to obtain additional money; he asked the addressee to contact him. On the 23rd defendant telephoned Meng and arranged a meeting for the 24th; they conversed on that day at the Plaza Hotel in Hollywood. Mills referred to a certain Clementine mine located about 35 miles from Barstow, California, and said he had discovered a vein bearing gold ore worth $1,400 per ton which ultimately should run around $60 a ton. Meng asked how much it would take to open the property and Mills said $10,000; when told that Meng then had only $3,000 but could raise more, he said that was enough to start with; that if it ran over $10,000 he would match dollar for dollar from the investing standpoint and each of them would receive 50 per cent; that it would be so set up; he would use a Nevada corporation known as Clark Uranium and Copper Company. Mills also said he held a lease on the mine and wanted Meng to go to the property to see the ore. Meng was to call him the next day. The asserted lease when received in evidence proved to be an option to buy the Clementine mining claim for $500 on or before January 1, 1958, with immediate possession and right of exploration conferred. For this document Mills had paid nothing. It bears the same date as the newspaper in which the advertisement was run. The parties finally arranged to go to the mine on the following Tuesday. When Mills arrived at Meng's house, Investigator Shrader was there and was introduced as a friend who was interested in the property and might invest some money. The three of them drove to Barstow and then to the mining claim. On the way, defendant was asked for proof that he had a lease and he exhibited the document of July 21st above mentioned; he called it a lease with option to purchase. Meng testified: "On the trip to Barstow we discussed the matter of how the stock was to be issued, at which time Mr. Mills stated that 50 per cent of the stock would be issued to Mr. Shrader and myself. He also stated that he would hold the remaining 50 per cent of the stock and then he proceeded to describe what was to be done on the property. . . . He stated that there had been no application or articles of incorporation filed in the State of California and that no stock had ever been issued in the Clark Uranium . . . and that there had never been a permit issued in the State of Nevada, either.

"He further stated that he would hold a meeting in Los Angeles here, at which time Mr. Shrader and myself would be placed on the board of directors, a members of the board of directors, and one of the other two parties who was on the board would be dropped and the meeting would then be adjourned and would reconvene in the El Cortez Hotel in Las Vegas, Nevada, at which time any changes in the articles of incorporation that had to be made would be made at that time and the stock would be issued up there and he would come back with the stock to California." Proposed development and rental of one Duncan's equipment were also discussed. After an inspection of the property, at which no gold ore was visible, Mills said he could easily find the vein of ore and if they did not put up the money he would go ahead with the development himself; also that he would handle the operation and supervise it without salary until the mine was paying a profit; that Meng and Shrader would be members of the board of directors, one of them vice-president and the other secretary, but so far as the operation of the mine was concerned they would have nothing to do with it; would merely be members of the company board of directors. He also said the funds would be placed in a bank and either Meng or Shrader would sign checks.

Meng and Mills met again on July 31st, defendant saying "he was very anxious to see me." On that occasion defendant exhibited a copy of the articles of incorporation of the Clark company and two copies of a written "Proposal" for Meng and Shrader. That document had been prepared by defendant who declared it needed no explanation. On the next day, August 1st, Meng and Shrader met defendant again at the Hollywood Plaza Hotel, having telephoned him that they would have their checks ready. At this meeting Mills explained that they would have a joint bank account in the company's name and he and one of the other two would be joint signers on any checks. Meng then said that business is business and he wanted something to show for his money, so Mills in his own handwriting dated the proposal, added "O.K." and placed his signature thereon. He also delivered a copy of minutes which he had drawn for a meeting of the corporate board of directors to be held on the next day in Long Beach and then adjourned to Las Vegas where the lease would be transferred to the company and shares of stock issued to Mills, Meng and Shrader, after which Mills was to bring back the stock to Meng and Shrader in California. He asked how they

wanted the certificates issued and they told him. Defendant said no stock had been printed but "we could use blank stock and fill those in or he could fill them in for us." The corporation had no assets, had issued no stock, had no permit to sell stock and only one meeting had been held, that for the purpose of organization. Mills told Meng and Shrader to make their checks to the company; when Meng handed his check to defendant he in turn gave it to Shrader who was to be corporate treasurer. Upon signing and delivery of the proposals and the checks Meng gave a signal and other officers who were in the background came forward and arrested Mills.[2]

The written proposal sets forth a "plan," the essential portions of which are quoted in the margin.[3] The minutes for the planned meeting of August 2nd say: "Director Homer C. Mills reports to the Board that he has contracted to purchase the Clementine Mining claim located 20 miles from Barstow, California, which contains commercial Tungsten deposits and a promising Gold-Silver deposit and that it appears to be economical to operate. He also reports that he has two parties who will advance up to $10,000.00 for the purpose of exploring and developing such property. He recommends that their

[2] The violation of the act was complete before the parties inspected the property; the transaction was carried forward to this point in order to obtain evidence over Mills' signature corroborating the prospective testimony of the two officers, Meng and Shrader.

[3] "That we take Clark Uranium & Copper Co., a Nevada Corporation, and use it to operate with. I am exhibiting to you a certified copy of the Article and the Charter issued by the Secretary of State, Carson City, Nevada. While the seal has been ordered, no stock has ever been issued or printed. It is immediately available. It's capital is $1,500,000.00, divided into shares 10¢ each, par value.

"For the committment of you two men to provide $10,000.00, altogether, I suggest that there be issued to you 200,000 shares of this Corporation in the proportions and amounts each of you contribute. I will take the same amount of shares to myself or order, which makes us 50-50 owners of this Corporation, whereupon I will deed to the Corporation the Clementine claim.

"This whole program can be completed at a single meeting of the Board of Directors at Los Angeles, California, when your funds are available. . . .

"We will place you two men on the Board as Directors and one of you can be Treasurer and all checks are to be signed by the President and Treasurer and to be used solely for the operation of the property in question. . . .

"The Directors for the time being will be yourselves J. H. Rinehart and myself. Mr. Rinehart is Secretary and I am President. You boys can determine among yourselves which one will be Treasurer and Vice-President. The Articles provide for a Board of 7 members and if some of my Las Vegas boys come and buy stock at 10¢ par, we may place one of them on the Board. I expect to go to work on the property next week."

offer to finance the property be accepted by this Company on a basis of one-half interest.

"Inasmuch as the Corporation is a Nevada Company and is not allowed to sell or offer for sale any stock in the Company, the matter of transferring this claim to the Corporation and paying therefore in shares of the Corporation and the dividing up of the shares to be issued for the property between the parties financing the operation and the Board of Directors, the latter being the sole shareholders or having any rights to shares, all acts of the Corporation to complete transaction must take place in Nevada.

"This meeting is hereby adjourned to meet at the El Cortez Hotel, Las Vegas, Nevada, at 8:00 P.M. on Saturday August 3, 1957, at which time the transfer of the mining property herein mentioned will be contracted to be conveyed to the Clark Uranium and Copper Co., and the shares to be issued in payment therefore will be issued and delivered. The meeting will also select a Bank in which all funds of the Corporation will be deposited and checked out on the joint signatures of the President and Treasurer of the Corporation. At said meeting the two parties acquiring an interest in the Corporation are to be placed on the Board of Directors and one is to become Vice-President and the other Treasurer of the Corporation."

Under the California statute an offer or attempt to sell comes within the definition of sale (Corp. Code, § 25009), and a sale made without an appropriate permit constitutes a crime (§ 26104). (*People* v. *Mills, supra,* 148 Cal.App.2d 392, 407; *Ogier* v. *Pacific Oil & Gas Development Corp.,* 135 Cal.App.2d 776, 779-780 [288 P.2d 101].) It is said in the cited case of *People* v. *Jaques, supra,* 137 Cal.App.2d 823, 832: "Even an agreement to reach an agreement to sell stock would be, at least, an 'offer to sell' which is prohibited by section 25009."

The evidence at bar discloses a palpable attempt at evasion of the California Corporate Securities Act. The offer to sell the stock was made and accepted in this state; the price was to be paid and the stock delivered here. The proposed meeting in Nevada was for the sole purpose of transferring the so-called lease to the corporation and having the stock issued there, delivered to Mills (the real seller)[4] and by him brought

---

[4] "'A sale of stock or other undivided interest in a corporation which is the seller's alter ego spells a sale by the issuer in legal contemplation.'" (*People* v. *Mills, supra,* 148 Cal.App.2d 392, 406.)

to Los Angeles for delivery to the buyers. The mere fact of issuance of the stock in Nevada does not save the transaction from the stigma of calculated evasion or from the sanctions prescribed by the statute for violation of its terms. That such is the law is attested by *Boteler* v. *Conway*, 23 Cal.App.2d 35, 39 [72 P.2d 208] ; *Leven* v. *Legarra*, 103 Cal.App.2d 319, 320 [229 P.2d 383] ; *Pollak* v. *Staunton*, 210 Cal. 656, 662 [293 P. 26] ; *Auslen* v. *Thompson*, 38 Cal.App.2d 204, 210 [101 P.2d 136] ; *Hardy* v. *Musicraft Records, Inc.*, 93 Cal.App. 2d 698, 701-703 [209 P.2d 839] ; *People* v. *Sears*, 138 Cal.App. 2d 773, 791 [292 P.2d 663] ; *People* v. *Sears*, 124 Cal.App.2d 839, 849 [269 P.2d 683] ; *B. C. Turf & Country Club, Ltd.* v. *Daugherty*, 94 Cal.App.2d 320, 329 [210 P.2d 760]. ▇ In the first cited Sears case it is said : ''The Corporate Securities Act clearly prohibits a foreign corporation from soliciting in California a sale of stock of its own issue without first securing a permit, even though in good faith the issuance of the stock and transfer of title are to take place in a foreign state.'' (*People* v. *Sears, supra*, 138 Cal.App.2d 773, 791.)

▇ The contention that the status of Meng and Shrader as corporate directors and officers precludes the application of the general rule cannot prevail. The point made by appellant is that the venture could not function without the active participation of Meng and Shrader because they were to be two of four directors, and all company checks were to be signed by one of them ; hence without their consent no money could be spent and no board action taken. ▇ The rule that where ''the assignee [buyer] is to share in the conduct of the enterprise, the instrument representing an assignment of a fractional interest . . . is not a security within the act'' (quoting *Austin* v. *Hallmark Oil Co., supra*, 21 Cal.2d 718, at 727), did not arise from any such corporate internal situation, nor was it intended to apply thereto. The doctrine grew out of the necessity of determining what is an investment contract or a certificate of interest or a participation in an unincorporated venture, such as a real estate subdivision, an oil well, a mine, or the like. (See *People* v. *Steele*, 2 Cal.App.2d 370, 374 [36 P.2d 40] ; *Gillis* v. *Pan American Western Petr. Co.*, 3 Cal.2d 249, 255 [44 P.2d 311] ; *People* v. *Syde, supra*, 37 Cal.2d 765, 768 ; *People* v. *Davenport*, 13 Cal.2d 681, 685 [91 P.2d 892] ; *Hollywood State Bank* v. *Wilde*, 70 Cal.App.2d 103, 107 [160 P.2d 846] ; *People* v. *Hoshor*, 92 Cal.App.2d 250, 255 [206 P.2d 882] ; *People* v. *Rankin*, 160 Cal.App.2d 93, 97 [325 P.2d 10].) To apply it to a sale of corporate

stock would open a broad avenue for safe evasion of the statute in cases of small operations. It would be necessary only to make the buyers corporate officers and directors with a controlling vote and sales of the company stock could be made without a permit and with impunity. Many a rascal would relinquish control of a speculation for cash in hand. Such an interpretation of the law would permit most closed corporations to issue stock without consulting the Commissioner of Corporations and later to resell the same to members of the public.

The initial "Blue Sky" legislation in this State was the Investment Companies Act (Stats. 1913, ch. 353, p. 715) which confined its definition of security to "stock, stock certificates, bonds, and other evidences of indebtedness, other than promissory notes not offered to the public by the maker thereof" (§ 2(b)). Note 13 on page 544 of 6A Cal.Jur. (§ 306), says: "The defect in the original act of 1913 was that it applied only to the issuance and sale of stock by the corporation itself, not to anything but 'stock' and not to resales of stock issued in other states by corporations thereof, and not to bonds, participation shares other than stocks, or to shares in unincorporated companies and trusts." The law proved defective because of the many investment arrangements devised to defeat its ends. Accordingly, it was strengthened by including participations of various sorts in the definition of security. Speaking of the Corporate Securities Act, as passed in 1917 and amended in 1919, the Supreme Court said, in *In re Girard*, 186 Cal. 718, 723 [200 P. 593] : "The provisions regarding companies, trusts, and trustees were inserted in the act for the evident purpose of preventing evasions such as would follow if the operation of the act was confined to corporations alone." The task then devolved upon the courts to determine what is a "security" (not what is a share of stock, the primary type of security), and in so doing to protect ordinary business transactions that are not within the evil at which the act is aimed (see *People* v. *Syde, supra,* 37 Cal.2d 765, 768; *People* v. *Rankin, supra,* 160 Cal.App.2d 93, 96), and to prevent evasion of the statute on the other hand. It was this problem that gave rise to the line of cases typified by *People* v. *Steele, supra,* 2 Cal.App.2d 370, 374, and other cases above cited, cases prescribing the test of whether the investor expects his profits to flow from his own efforts or from those of others. None of said cases holds or intimates that a corporate structure can be set up which will

exempt sale of the stock from control of the statute. ▮▮▮ We hold that appellant's attempt thus to evade the law cannot succeed; that sale of stock without a permit violates the statute regardless of the control of the shares of the issuing corporation. A sale of 75 per cent of the stock in one block is as much a violation of the act as a sale of 5 per cent. The actual rulings in *People* v. *Staver, supra,* 115 Cal.App.2d 711 and *People* v. *Jaques, supra,* 137 Cal.App.2d 823, relied upon by appellant, are not opposed to the views just expressed.

Staver dealt with an agreement which the attorney general claimed to be invalid as a preorganization agreement, i.e., one made before incorporation. Concerning this contention the court said, at page 722: "It is not the taking of subscriptions for shares of a domestic or foreign corporation made prior to the inception thereof that is prohibited (Corp. Code, § 25153). What is prohibited by the section is the collection of any portion of the consideration to be paid on account of subscriptions made prior to incorporation, unless a permit has been issued by the commissioner authorizing such collections.

"Here we are confronted with a situation wherein the agreement of the contracting parties was that they would form a corporation in the future, and that when such corporation was organized the manager of each store being operated by the Staver Building Material Company would take stock in the corporation based upon the inventory value of his business and other considerations. It cannot be assumed in a criminal prosecution that any stock would be issued without the permission of the Commissioner of Corporations. We fail to perceive wherein the agreements here in question can be regarded as a collection of a consideration to be paid on account of subscriptions for stock made prior to such incorporation." Language found at page 721 intimating that the philosophy of *People* v. *Syde, supra,* 37 Cal.2d 765, might be applicable merely repeats a concession made by the attorney general.

The Jaques case, *supra,* dealt with an arrangement whereby one Weaver advanced $7,500 to be used for purchase of stock in a corporation which was to be formed for prosecution of a certain venture, but upon condition that he have employment agreeable to himself. The court said that the facts showed a sale of a security "unless the fact that Weaver's purchase was contingent upon his being employed by the proposed corporation changes the legal effect." (P. 832.) It was held that *People* v. *Syde, supra,* 37 Cal.2d 765, and *People* v. *Davenport, supra,* 13 Cal.2d 681, were not controlling. After discussing

those cases the court said, at page 834: "A general rule may be deduced from the cases to the effect that if the enterprise is in the nature of a joint venture or if the investor is to have an active participation in its formation, or its operation is dependent for its success partly on the efforts of the particular investor, then, in any such event, the Corporate Securities Law does not apply." This statement is too broad, as appears from the court's reliance upon certain Minnesota cases reviewed at page 835, and from this concluding paragraph of the discussion: "In our case, the agreement was that Weaver was to receive stock and to work for the corporation as vice president or secretary. The Gopher Tire case (*supra* [146 Minn. 52 (177 N.W. 937)]), indicates that where the corporation can operate just as well without the services of the one agreeing to buy stock, the agreement comes within the terms of the Blue Sky Law. (See 25 So.Cal.L.Rev., p. 210.) Applying that test here, it appears that the proposed corporation when formed could operate without Weaver. While there was some discussion of his helping in the advertising of the proposed corporation and in the selling of stock, his services were not indispensable. His participation either before or after incorporation was not to be the active participation which would make the enterprise a joint adventure, or would make the agreement any the less an 'investment contract' or an agreement to buy corporate stock." This case was not passed upon by the Supreme Court and we consider that intimations in the opinion that agreed personal services of the buyer can immunize a sale of stock without a permit do not bind us. Certainly the ruling in the case, as distinguished from its general language, is not opposed to the holding at bar. We do not mean to say that a bona fide joint venture would violate the statute merely because of an expressed intention to incorporate in the future and then issue stock. (See *Polizzi* v. *Porcaro*, 110 Cal.App.2d 395, 399 [242 P.2d 949] ; *Nicholl* v. *Ipsen*, 130 Cal.App.2d 452, 457-460 [278 P.2d 927].) That is not the situation before us.

The foregoing ruling disposes of the contention that the court erred in refusing to give a requested instruction (found at page 44, clerk's transcript) which reflects defendant's theory of the applicability of *People* v. *Syde, supra,* and similar cases.

Appellant urges, as he did below, the defense of entrapment. He complains of refusal to give the following instruction: "The court instructs the jury that 'entrapment' is the

conception and planning of an offense by an officer and his procurement of its commission by one who would not have perpetrated the offense except for the trickery, persuasion and fraud of such officer.'' Its language is inappropriate, for there was no trickery, persuasion or fraud here. More importantly, there is no evidence that the ''conception and planning'' of the offense was that of the officers rather than defendant. The court gave full instructions on this subject which are not criticized and which amply covered the matter. One of them, set forth in the footnote, was sufficient of itself to occupy the entire ground.[5]

This issue was resolved against appellant by jury and by judge. It would have been difficult and erroneous to reach a different conclusion. In *People* v. *Bowlby*, 135 Cal.App.2d 519, 529 [287 P.2d 547, 53 A.L.R.2d 1147], it is said: ''It is essential to such a defense that the criminal intent originate with the one who is alleged to have entrapped defendant and that the crime be induced by him through persuasion or the like. His merely furnishing the occasion for one engaged in illegal activities to ply his trade does not amount to entrapment. *People* v. *Braddock*, 41 Cal.2d 794, 802 [264 P.2d 521] : 'The many decisions in this state which define the defense of entrapment were reviewed in *People* v. *Lindsey*, 91 Cal.App.2d 914 [205 P.2d 1114], and the law stated as follows: ''Where the doing of an act is a crime, regardless of the consent of anyone, the courts are agreed that if the criminal intent originates in the mind of the accused and the offense is completed, the fact that an opportunity was furnished, or that the accused is aided in the commission of the crime in order to secure the evidence necessary to prosecute him therefor, constitutes no defense. (Citations.) If the officer uses no more persuasion than is necessary to an ordinary sale, and the accused is ready and willing to make the sale, there is no entrapment.'' (P. 917.) More recently it was

---

[5] ''The Court instructs the jury that the law does not tolerate a person, particularly a law enforcement officer, generating in the mind of a person who is innocent of any criminal purpose, the original intent to commit a crime, thus entrapping such person into the commission of a crime which he would not have committed, or even contemplated but for such inducement; and where a crime is committed as a consequence of such entrapment, no conviction may be had of the person so entrapped as his acts do not constitute a crime.

''If the intent to commit the crime did not originate with the defendant and he was not carrying out his own criminal purpose, but the crime was suggested by another person acting with the purpose of entrapping and causing the arrest of defendant, then the defendant is not criminal [sic] liable for the acts so committed.''

held: "It is not the entrapment of a criminal upon which the law frowns, but the seduction of innocent people into a criminal career by its officers is what is condemned and will not be tolerated. Where an accused has a preexisting criminal intent, the fact that when solicited by a decoy he committed a crime raises no inference of unlawful entrapment." '

▮ *People* v. *Terry*, 44 Cal.2d 371, 372 [282 P.2d 19] : 'As to the first contention, "entrapment 'is a positive defense imposing upon an accused the burden of showing that he was induced to commit the act for which he is on trial' [citing cases]. ▮ Entrapment as a matter of law is not established where there is any substantial evidence in the record from which it may be inferred that the criminal intent to commit the particular offense originated in the mind of the accused." ' And the question is one of fact for the trial court's determination (*Id.* at p. 375)." To the same effect, see *People* v. *Malotte*, 46 Cal.2d 59, 65 [292 P.2d 517] ; *People* v. *Nunn*, 46 Cal.2d 460, 471 [296 P.2d 813].

▮ It was defendant who started the violation of the law by placing his advertisement in the Los Angeles Times. Its aroma excited the interest of the district attorney's office. When Meng's letter was received defendant telephoned and arranged to meet him. Defendant volunteered the information that he had the Clementine mine with a showing of $1,400 ore, proposed that Meng, if he put up the necessary money, would receive 50 per cent; it would be so set up and to that end he would use a Nevada corporation. Mills volunteered to show Meng the mine, exhibited a so-called lease bearing the same date as the newspaper advertisement; said that 50 per cent of the corporate stock would be issued to Meng and Shrader; told of the absence of a permit to sell stock and outlined his plan to evade the law by issuing the shares in Nevada. In all this there is nothing to raise an inference that the criminal intent originated in the minds of the officers or anywhere other than defendant's own thinking. The officers merely gave him opportunity to ply his unlawful trade.

▮ It is argued that no crime is alleged in the information and that the proof does not establish the commission of one. The contention is based upon the difference in the language of sections 26104 and 25009, Corporations Code. The former brands as a felon anyone who "aids in the issue or sale of . . . or sells, or causes or assists in causing to be issued, executed, or sold, any security" etc. Section 25009 says that "sale" or "sell" includes every "disposition, or

attempt to dispose, of a security''; also, ''an offer to sell; an attempt to sell; a solicitation of a sale.'' The argument is that appellant was not charged with selling, but merely offering for sale, and hence the crime defined in section 26104 was not alleged, for that section does not mention an offer or an attempt. Actually the charge of Count I of the information is that defendant did ''knowingly sell and offer to sell'' the described shares of stock; that of Count II is that defendant did ''offer to sell'' an interest in a mining title and lease. Thus defendant had explicit notice in both counts that he was called upon to answer to a charge of offering to sell a security without a permit. It is obvious that the definition of sale found in section 25009 inheres in section 26104, and hence a charge of selling includes a charge of offering to sell. It is well settled that an indictment or information properly may charge a crime in the language of the statute. (Pen. Code, § 952.) ■■■ And any uncertainty arising from that type of averment is dispelled by reference to the transcript of the preliminary or grand jury hearing which defendant receives as a matter of right. ■■■ ''An information is formally sufficient if, in substance, it charges the defendant with the commission of a public offense in words 'sufficient to give the accused notice of the offense of which he is accused.' (Pen. Code, § 952.) ■■■ To be material, a variance between the information and proof must be 'of such a substantive character as to mislead the accused in preparing his defense, or . . . likely to place him in second jeopardy for the same offense.' '' (*People* v. *Braddock*, 41 Cal.2d 794, 799 [264 P.2d 521].) ''It is only required that the pleading be 'in any words sufficient to give the accused notice of the offense of which he is accused.' (Pen. Code, § 952.) Notice of the particular circumstances of the offense is given not by detailed pleading but by the transcript of the evidence before the committing magistrate (or the grand jury); defendant is entitled to such transcript under section 870 (or section 925) of the Penal Code.'' (*People* v. *Roberts*, 40 Cal.2d 483, 486 [254 P.2d 501].) See also *People* v. *Randazzo*, 48 Cal.2d 484, 489 [310 P.2d 413]; 26 Cal.Jur.2d § 38, p. 495. In *People* v. *Sears*, *supra*, 138 Cal. App.2d 773, 793, it is said: ''Appellant's claim that the statute is vague and indefinite and for that reason does not state a public offense is untenable. The language of the Corporate Securities Law provides an adequate warning as to what conduct comes within its prohibition. [Citations.] The language conveys a sufficiently definite warning from which any person

engaging in the business of issuing or selling securities may ascertain whether his business or enterprise has a sanction of law. Appellant was charged with the crime in terms of the enactment describing the offense and was informed of the action of which he was accused to the extent sufficient to enable him to defend himself. Furthermore, at the trial, appellant was fortified with a copy of the testimony given before the committing magistrate (Pen. Code, § 870)."

 There is no merit in the claim that the information charged no offense or that the statute is too vague to be constitutional. The foregoing authorities preclude any other holding.

Appellant makes numerous other contentions which require but brief comment.

 Refusal of defendant's requested instruction to the effect that anyone in the exercise of his inalienable rights may dispose of his property in such innocent manner and for such price as he pleases, was not error. It was clearly inappropriate.

 The proposed instruction to the effect that the Corporate Securities Law "has no application to a purely private transactions as described in other instructions herein given," was properly refused It would have taken the case from the jury and, as hereinabove shown, does not correctly state the law.

 Appellant says in his opening brief: "It was error to refuse defendant's requested instruction based upon the defense that the transaction never was completed and if and when completed, would have been a Nevada contract." The point is not well taken, this for the reasons appearing in the above discussion of whether the instant transaction involved a security. Moreover, the evidence would not support an inference that the transaction, if and when completed, would have been a Nevada contract. It was made and to be performed in California. The last act was not to be done in Nevada but in California when the stock was delivered to Meng and Shrader. *Oakley v. Rosen,* 76 Cal.App.2d 310 [173 P.2d 55] is not apposite. It dealt with a bona fide joint venture and a contract which was to be completed and performed in New York. Neither of those controlling facts is proved or inferable at bar.

 Defendant asked the court to instruct that "it cannot be presumed that the defendant would offer to sell any stock in Clark Uranium & Copper Co., without a permit from

the Commissioner of Corporations of California.'' This language was borrowed from *People* v. *Staver, supra,* 115 Cal.2d 711, 722, wherein it was used in discussing the effect of the evidence. That does not mean that it necessarily was proper as a jury instruction. (*Sloan* v. *Stearns,* 137 Cal.App.2d 289, 299-300 [290 P.2d 382].) The subject was adequately covered by instructions on reasonable doubt and presumption of innocence.

 The contention that it was error to refuse a requested instruction concerning delay in taking defendant before a magistrate notwithstanding his demands therefor, and that ''you can take these facts and circumstances into consideration in arriving at your verdicts, in determining whether the officer and others participating in the arrest of the defendant acted in good faith,'' cannot prevail. The assumed facts, if true, had no bearing upon defendant's guilt or innocence or upon the fairness of his trial. (*Cf. People* v. *Allen,* 142 Cal.App.2d 267, 286 [298 P.2d 714] ; *People* v. *McCrasky,* 149 Cal.App.2d 630, 637 [309 P.2d 115] ; *People* v. *Jablon,* 153 Cal.App.2d 456, 461 [314 P.2d 824] ; *Cicenia* v. *La Gay,* 357 U.S. 504 [78 S.Ct. 1297, 2 L.Ed.2d 1523, 1528].)

 Asserted prejudicial misconduct of the prosecutor finds no support in the record. Matters of which appellant complains constituted legitimate argument. Moreover, defendant made no assignment of misconduct at the trial, nor did he move to strike any of the prosecutor's remarks except in one instance. The record shows that the assignment was unfounded, that the prosecutor was making a statement the truth of which defendant insisted upon. The objection comes too late. (See *People* v. *Sieber,* 201 Cal. 341, 356 [257 P. 64] ; *People* v. *Weiss,* 50 Cal.2d 535, 555-557 [327 P.2d 527].)

 ''A party is not privileged to sit silent in the presence of statements deemed detrimental to his interest and rely for salvation upon an appeal.'' (*People* v. *Stewart,* 109 Cal. App.2d 334, 340 [240 P.2d 704].)

 Error, if any, in receiving the testimony of one Harold I. Lyvers was not prejudicial. He, a mining engineer, saw and pursued defendant's advertisement of July 21, 1957, had a conversation with Mills in which, according to his testimony, he was not offered any stock or any interest in the mine. He was not looking for an investment but wanted employment with a mining operator. When Mills found that Lyvers was not a prospective investor that closed the interview. This conversation was received in evidence over defendant's objec-

tion, but upon the prosecutor's assurance that it was part of proof of a general scheme and plan on defendant's part. That scheme and plan was not further developed, but Lyvers' testimony was in no wise hurtful to defendant and could not possibly work a reversal if found to have been erroneously received.

 The claim that the People should have been required to elect between Counts I and II when defendant so moved at the close of the trial cannot be sustained. The theory of the motion seems to be that submitting both counts to the jury would be a denial of due process because both offenses arise from a single set of facts. Section 954, Penal Code, governs such a situation. It specifically authorizes charging in a single accusatory proceeding "two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts." It further says: "The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged." The constitutionality of § 954 has been upheld. (See *People* v. *Kelly*, 203 Cal. 128, 133-135 [263 P. 226]; *In re Culver*, 84 Cal.App. 295, 297 [257 P. 876]; *People* v. *Grossman*, 28 Cal.App.2d 193, 203 [82 P.2d 76].)

Judgment and order affirmed.

Fox, P. J., and Herndon, J., concurred.