[Crim. No. 7585. Second Dist., Div. Two. July 30, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. LAURENCE G. BEDILION et al., Defendants and Appellants.

Harold Cutler for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Mario A. Roberti, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—After a nonjury trial, appellants Laurence G. Bedilion and Alice M. Bedilion were convicted of two crimes alleged substantially as follows in the two counts of the information:

(1) That on or about December 2, 1960, appellants, in violation of section 475 of the Penal Code, "did willfully, unlawfully, feloniously and knowingly have in their possession forged checks for the payment of money, knowing the same to be forged, with the intent to permit, or cause, or procure the same to be filled up and completed in order to pass the same with the intentions of defrauding San Fernando Valley Restaurant Employer-Union Welfare Fund, Bank of America National Trust and Savings Association, Studio City Branch."[1]

(2) That appellants conspired to violate section 182 of the Penal Code in that on or about December 2, 1960, they "did willfully, unlawfully and feloniously conspire, combine, confederate and agree together to make, alter, forge and counterfeit certain checks and order in writing for the payment of money in the sum of in excess of $10,000.00, and did then and there conspire to utter, publish and pass the same, knowing that said checks were false, altered, forged and counterfeited with intent then and there to cheat and defraud the San Fernando Valley Restaurant Employer-Union Welfare Fund, Bank of America National Trust and Savings Association, Studio City Branch."

The information alleged four overt acts of appellants com-

---

[1] See definition of "forgery" as set forth in Penal Code, section 470, quoted below.

mitted by them in pursuance of said conspiracy, all of which were proved, as will be shown hereinafter by our summary of the evidence. After the entry of the judgment of conviction, appellants filed their notice of appeal "from the verdict and conviction in said action rendered on January 27, 1961, and from the judgment in said action rendered on March 10, 1961, and from all appealable orders" rendered in favor of respondent.

The contentions advanced by appellants on this appeal are stated by them as follows: "(1) An information charging a violation of section 475 of the Penal Code which charges the appellants with the possession of forged checks with the intent to cause said checks to be filled up and completed does not charge a criminal offense and is void. (2) A conviction under section 182 of the Penal Code cannot be sustained where there is a material variance between the overt act proven to effect the object of the conspiratorial purpose and the act alleged in the information. (3) The evidence is insufficient to sustain the conviction under Article VI, Section 4½ of the Constitution of the State of California."

On the night of November 10, 1960, some three hundred checks of the San Fernando Valley Restaurant Employer-Union Welfare Fund and a Paymaster checkwriter were stolen from its office, located in Hollywood, California. Stolen at the same time were People's Exhibit One, a $50 check drawn on the account of said Welfare Fund at the Studio City branch of Bank of America, and People's Exhibit Two, four envelopes of checks drawn on the same account at the same bank, all appearing to be checks of the Welfare Fund, bearing numbers running in sequence, and the amount of $50 filled in by said checkwriter. The missing Paymaster check protector left marks similar to those appearing in the dollar column of the checks in evidence, namely, "Valley Welfare Fund, $50.00." These checks, however, had not been issued by said Welfare Fund.

On November 29, 1960, Sergeant Sweeney, a police officer of the City of Vernon, went to the Rocket Room on Wilshire Boulevard in Los Angeles where he met appellant Alice Bedillion. She gave him a fictitious name—Kathy Granger. The officer stated, "I understand you have some paper[2] for sale." Alice replied, "Yes, I have got quite a bit. . . ." She stated

---

[2]Among criminal or underworld elements, checks are often referred to as "paper."

that she had a large amount for sale, approximately $24,000 worth. As a sample to show Sweeney, she produced People's Exhibit One.

The officer testified: ''A. I made a cursory examination of this check, and I asked the defendant Alice Bedilion if this check was hot. She said, 'No, it was maybe a little warm, but none of these checks were on the street.' We had some other talk involving a physical condition, problems she had. She had been to a dentist, so forth and so on. We discussed the possibilities of passing it. Q. Passing what? A. These checks. I was basing my questions on the possibility of being apprehended as a check passer. She stated that there was no worry again, due to the fact that these checks were not on the street at this time.''

The bartender then called for Kathy Granger, stating that he had a telephone call for her. After a short conversation, Alice returned and told the officer that she had spoken to her ''old man'' about the deal. She stated that she and her ''old man'' wanted $5,000 for the checks. Sweeney replied that due to the fact that the checks were hard to pass, they were worth only $3,500. Alice thereupon made another telephone call. She immediately returned and told Sweeney: ''That was my old man I was talking to and he stated that $3500.00 was a good price, and that you could take the sample check and show it to the people that you are working for.'' The officer obtained a telephone number from her and then left with People's Exhibit One in his possession.

On December 1, 1960, Officer Sweeney made two telephone calls to the number which Alice had given him.[3] The first conversation dealt mainly with talk about the officer's contacts, and the Bedilions' belief that the $3,500 figure was a reasonable one. Sweeney told Alice that his contacts thought the price of $3,500 was satisfactory. The second call was made to inform the Bedilions that Sweeney had all the money but $500. During this conversation Alice suggested that Sweeney bring them the $3,000 and pay them the $500 later. He told her that he would call her back the following morning.

On the morning of December 2, 1960, Officer Sweeney telephoned Alice Bedilion from the police department, with Sergeant James present and listening in on the conversation, during which Sweeney made arrangements to meet appellants at their residence at 621 South Wilton Place, Los Angeles, at

---

[3]The telephone number Alice had given the officer was that of an answering service which relayed the calls to her.

about 11:30 a. m. that morning. Sweeney promptly proceeded to appellants' residence with surveillance officers of the police department accompanying him. Sweeney rang the doorbell and Alice opened the door. He entered, was seated on a sofa and had a brief conversation with Alice. During this entire transaction, Officer Sweeney was known to appellants as ''Frank Toorman.'' Sweeney asked, ''Is the deal all ready to go? Is everything here?'' She answered in the affirmative and Sweeney then said: ''Well, I have got about three or four hundred dollars. I'm going to have to get in touch with my people for the rest of the money.'' After some further conversation, Sweeney said: ''Could I talk to your old man?'' She replied: ''Sure.''

Alice then left the room and returned with appellant Laurence Bedilion. After having been introduced to Laurence, Sweeney asked him: ''Is the deal all ready to go?'' Laurence replied: ''Yes, it is.'' After Sweeney had shown him some money, Laurence left the room and returned shortly with People's Exhibit Two. He opened the envelopes, removed some of the checks and showed them to the officer. When the officer asked whether the checks were ''hot'' Laurence replied, ''Well, yes, but none are out so far.'' Laurence told Sweeney that ''the checks were hot.''[4]

Laurence advised the officer ''to be sure and stay away from large businesses, such as super markets, and so forth, and to stick to the small neighborhood drug stores and markets, very small ones, due to the fact that the big systems or big stores sometimes check phone numbers and check businesses before they cash checks.'' Sweeney then asked Laurence if he had the check protector and Laurence replied: ''No, that has been dumped a long time ago.''

When Sweeney asked: ''. . . is there any chance of getting some check protector?'' Laurence replied: ''I know of a couple that possibly we can get later. Laurence further suggested that for identification purposes Sweeney probably could obtain some operator's licenses and a couple of social security cards. Sweeney asked about the signature that should be placed on the checks over the designation ''Secretary-Chairman.'' Laurence stated that he did not know these names, but that Sweeney could obtain them by calling that location on some pretense.

---

[4] In the jargon of criminal elements, the expression meant that the checks had been stolen.

Officer Sweeney then made a telephone call under the pretext that he had to call "Si," who was in business with him, and that "Si" would bring the money. Sweeney called a surveillance officer and stated a prearranged code message. After an interval of a few minutes, there was a knock on the door. Sweeney and Bedilion, who had picked up the four envelopes, then proceeded down a corridor and into a bedroom. Alice opened the door and Sergeants Lang, Bell and James, the surveillance officers, entered and went into the bedroom where they arrested Bedilion and pretended to arrest Sweeney. Sergeant James removed the four envelopes from Bedilion's person. Sweeney accompanied the appellants when they were taken to the police station and booked. Sweeney was booked fictitiously.

The court has concluded that first of appellants' contentions is well taken, but that the other two are wholly devoid of merit. We agree with appellants that the prosecution failed to allege or prove facts sufficient to constitute a violation of section 475 of the Penal Code as it read prior to its amendment in 1961.

Prior to its amendment in 1961, section 475 provided two methods by which it might be violated. The *first*, in substance, made it a felony for a person to *possess or receive* "any forged promissory note or bank bill, or bills, for the payment of money or property, with the intention to pass the same . . ." to defraud another. The *second* portion of section 475 provided in substance that a violation would occur if a person had or kept in his possession "any blank or unfinished note *or bank bill made in the form or similitude of any promissory note or bill for payment of money or property, made to be issued by any incorporated bank or banking company,* with intention to fill up and complete such blank and unfinished note or bill, or to permit, or cause, or procure the same to be filled up and completed in order to utter or pass the same, or to permit, or cause, or procure the same to be uttered or passed, to defraud any person, . . ." (Emphasis added.) The evidence shows that *neither* provision was violated.

 Again without determining whether or not a check fell within the first portion of section 475 prior to its 1961 amendment, it is apparent that the instruments here involved were not forged, inasmuch as they contained no date, no written amount, no payee, nor any signature or signatures. Having no validity or appearance of genuineness upon their face, they were incapable of defrauding anyone in their existing condi-

tion. (*People* v. *McKenna,* 11 Cal.2d 327, 332 [79 P.2d 1065] ; *People* v. *Morgan,* 140 Cal.App.2d 796, 800 [296 P.2d 75].) It is likewise apparent from the face of the instruments that they were not made in the form or similitude of notes or bills made to be issued by any incorporated bank or banking company.

Regardless of the character of a check under our modern negotiable instruments law, it was not, and is not now, a *bank bill* or *bank note.* A satisfactory analysis of the purpose of section 475 of the Penal Code, as it read prior to its amendment in 1961, requires that note be taken that it had remained unchanged since its enactment in 1872 and that in its codification it remained substantially in the same form and language as it appeared in the Crimes and Punishment Act. (Stats. 1850, ch. 99, § 76, p. 238.) At that time the expressions "bank bill" and "bank note" were synonymous terms, and the word "bill" in "bank bill" derived from the expression "bill of credit" as used in early banking history, rather than from "bill of exchange," a three-party instrument which includes a check under the terms of section 3265a of the Civil Code. (6 C.J. p. 1180 et seq.) "A check differs materially from a bank note. The latter is issued as currency under legal restrictions which give to it the character of money. The check is not currency, although it may pass current from hand to hand." (6 C.J. p. 1184.) "The words 'bank bill' and 'bank note' are synonymous terms. A bank bill or a bank note may be defined as a written promise on the part of the bank to pay to the bearer a certain sum of money, on demand; an obligation for the payment of money on demand, passing from hand to hand as money ; . . ." (6 C.J. p. 1183; see also 5 Words and Phrases, p. 109, and cases cited therein.)

Of course, today the issuance of such bank notes or bills is generally forbidden private banks and "bills," our paper currency, are issued only by the Federal Reserve banks. (*Cf.* Pen. Code, § 648 ; 9 C.J.S. § 185, p. 398.)

Clearly, it was the meaning of the terms as used in the earlier enactments that was intended by the Legislature in its codification of section 475 ; otherwise, the words "similitude" and "counterfeit" would not have been used nor would there have been a requirement that the instrument be of the type "to be issued by any incorporated bank or banking company." A "bank note" was distinguished from a "banker's note" in that the latter was "a promissory note

given by a private banker or banking institution, not incorporated. . . ." (6 C.J. p. 1181.)

The Legislature apparently determined in 1961 that checks and other instruments had become such a common method of exchanging money that their possession in an unfinished state by a person intending to fill them up and pass them to defraud others should be covered by the statute. However, such was not the law at the time of the commission of defendants' acts in 1960; accordingly, the conviction under Count One must be reversed.

Appellants' contention that their conviction under section 182 of the Penal Code cannot be sustained because of a material variance between the overt acts proven to effect the object of the conspiratorial purpose and the acts alleged in the information is without merit. Section 470 of the Penal Code provides in material part as follows:

"Every person who, with intent to defraud, . . . falsely makes, alters, forges, or counterfeits, any . . . check, draft, bill of exchange, . . . or utters, publishes, passes, or attempts to pass, as true and genuine, any of the above named false, altered, forged, or counterfeited matters, . . . with intent to prejudice, damage, or defraud any person; or who, with intent to defraud, alters, corrupts, or falsifies any . . . instrument, the record of which is by law evidence, . . . is guilty of forgery."

It appears to us wholly futile to deny that the above-quoted allegations of Count Two clearly, fully, and with complete sufficiency allege that appellants conspired to violate the quoted provisions of section 470, and that each and every overt act of appellants in pursuit of said conspiracy alleged in the information was proved. The purpose of an indictment or an information is to give the accused notice of the charge upon which he is to be tried. The particular circumstances of the charge are furnished to him by the transcript of the preliminary hearing. (*People* v. *Roberts,* 40 Cal.2d 483, 486 [254 P.2d 501] ; *People* v. *Mills,* 162 Cal.App.2d 840, 856 [328 P.2d 1049] ; *People* v. *Massey,* 151 Cal.App.2d 623, 649 [312 P.2d 365] ; *People* v. *Mason,* 184 Cal.App.2d 317, 354-355 [7 Cal.Rptr. 627].)

Common design is the essence of the conspiracy and the crime may be committed whether the parties act separately, or together, or by the same or different means, as long as their actions lead to the same unlawful object. (*People* v. *Buono,* 191 Cal.App.2d 203, 215 [12 Cal.Rptr. 604].)

The conspiracy count is a separate and distinct charge.

(*People* v. *Robinson*, 43 Cal.2d 132, 138 [271 P.2d 865].)

It is not necessary that the object of the conspiracy be carried out or completed. (*People* v. *Darnell*, 97 Cal.App. 2d 630, 636 [218 P.2d 172].)

The evidence clearly proves a common design on the part of appellants to conspire with Officer Sweeney to commit the crime of forgery, as defined in section 470, with the intent to defraud.

From the above recited evidence it readily may be inferred that defendants used the checkwriter to imprint the amounts in the checks; but, in any event, it is clear that they knew the checks were stolen and that the stolen check protector had been used to fill in the amounts. They also knew that the police officer who posed as the prospective buyer of these checks had indicated his intention to complete them and thereafter pass them as genuine. Defendants assisted him in his plan by advising him: (1) that although the checks were "hot," there would be little risk in passing them, since "none were on the street"; (2) that he could determine the name of the party or parties designated on the checks as "Secretary" and "Chairman" by telephoning the Fund on some pretext; and (3) that the checks could be passed more safely in small neighborhood drug stores and markets than at larger businesses where telephonic confirmations were sometimes made before checks were accepted. The sufficiency of the evidence to sustain the conviction of appellants on this count is beyond serious question.

The purported appeals from the verdict and from the unspecified orders are dismissed. The judgment of conviction on the first count is reversed; the judgment of conviction on the second count is affirmed.

Fox, P. J., and Ashburn, J., concurred.