[Crim. No. 3119.  First Dist., Div. One.  Dec. 19, 1955.]

THE PEOPLE, Respondent, v. FRANK M. JAQUES,
Appellant.

A. Lawrence Burbank, James M. Fletcher and Phillip A. Kennedy for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Chief Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

BRAY, J.—Defendant was indicted for and convicted by a jury of two offenses: (1) violation of section 26104, Corporations Code (Corporate Securities Law), selling a security of Forbescraft Company without a permit of the Corporation Commissioner; (2) grand theft of $7,500 from one Weaver. He was sentenced to the county jail for one year on each count, sentence to run concurrently. Likewise on each count execution of sentence was suspended and he was given three years' probation. Defendant appeals from the judgment and the order denying a new trial.

### QUESTIONS PRESENTED

1. Sufficiency of the evidence. As to count 1 this depends upon whether there was a "sale" of a "security," and as to count 2, upon whether there was any intent to deprive Weaver of his money.

2. Did the court properly review the evidence on motion for new trial?

### EVIDENCE

One Forbes (dead at the time of trial) had devised processes for dehydrating fruits and vegetables under high temperature. Defendant was a licensed real estate, insurance and business opportunity broker. Early in December, 1951, a Mrs. Mercer, a Mrs. Lane and a Mrs. Sutherland, at the suggestion of Mrs. Mercer, visited Forbes' plant at Napa. They were impressed with the possibilities of the processes. Later, after the other women were introduced to defendant by Mrs. Mercer,

they gave defendant checks payable to Mrs. Mercer totaling $10,000 to use to obtain the Forbes processes and in promoting a corporation to develop the "Forbescraft products," defendant to act as general manager for the women in the handling of these funds and to hire attorneys and chemists at his discretion. Defendant then hired an engineer named Harnden to investigate Forbes' processes. The same day an agreement was signed by Forbes, Mrs. Mercer and defendant, in which Forbes agreed to transfer to the latter his present and future processes. Weaver, the complaining witness, was a British subject and lawyer. He studied law at Cambridge University. Weaver was living in Mexico attempting to obtain permission to reside permanently in the United States. In February, 1952, he was in California on a temporary permit. The two women took him to the Forbes home at Napa, where Forbes was experimenting with his processes. Weaver had run a health hostel in England and formed the opinion that the products could be developed, manufactured and sold. Defendant came in and was introduced to Weaver. Defendant told Mrs. Sutherland that he would be glad to have Weaver associate with them as he would be valuable in introducing food products in foreign countries, because he spoke several languages. Later that day at defendant's office in Novato defendant told Weaver that he intended to set up a corporation (variously referred to as Forbescraft, Forbes Honeycraft, and Honeycraft) to exploit the Forbes processes; that he had already received money from Mrs. Sutherland and was thinking of selling more shares in the corporation; that he was sure that certain concerns would be interested in marketing the products. Weaver stated that he was disposed to invest in the proposed corporation provided he could have employment in it. Defendant said that it would be possible to give him the position of either vice president or secretary at a salary of $250 per month, plus free living quarters for himself and family. Weaver then returned to Mexico. February 29th, Weaver wrote Mrs. Sutherland stating he had decided on "coming to join in the 'Honeycraft' venture" and suggesting that it would be useful if defendant sent him a letter formally confirming the employment arrangements theretofore discussed. He then stated he had spoken of the Honeycraft project to a number of people and they showed great interest in it. On March 15th, defendant wrote Weaver stating that he was replying to Weaver's letter to Mrs. Sutherland that he was happy that Weaver had decided "to come in with us

upon the venture." At the present time he had a vacant house and would like to know when Weaver would need it. He then stated that his understanding of the proposed arrangement was that Weaver was "to put in $7,500.00 towards the furthering of the venture in mind, and with my understanding and my talk to you that you were to receive a salary of $250.00 per month plus a house." He asked Weaver to confirm this understanding. March 25th, Weaver wrote defendant that defendant's statement of the arrangement was correct, but that as the question of Weaver being permitted to enter the United States for residence had not been determined, he suggested that everything be left in abeyance until Weaver knew that he would be able to do so. April 17th, defendant wrote Weaver, "We have made considerable progress regarding our project" and suggested that even though Weaver might not be able to leave Mexico as soon as he desired, Weaver make some investment in "this proposition." He then stated that Forbes had made some recent discoveries which the "chemist, chemist analysis and engineers prove to be quite a revolutionary phase in the development of our product," that defendant had taken it up with patent attorneys and the formulas were in the process of being patented. It looked favorable for the manufacture of the products and defendant suggested that Weaver let him know if he wanted to invest "before we close this for any further investment."

Later in the month Weaver came to Novato and saw defendant, who said that things were progressing satisfactorily and that Forbes' inventions still remained capable of being exploited. Weaver stated that because of uncertainty concerning his entry permit he could not decide whether he could invest. He returned to Mexico. July 19th, Weaver wrote defendant stating that it would be six to twelve weeks before he would know about his permit; "When we last met we discussed the possibility of my coming up to Novato with my family during the waiting period and of our having an informal arrangement under which you would put some kind of housing accommodation at our disposal, while I would help you in whatever work there is to be done in connection with the Napa project or in your general office work. This would enable us to get to know one another better and it would be easier to decide if I could be of use on a permanent basis. . . . As regards the investment I was to make if I came to join you, I suggest that as evidence of good faith I should

place $7,500.00 in a special account (perhaps in our joint names?), with the understanding that I could withdraw it if I am not admitted to the United States for permanent residence or if after the trial period I am not needed. If we come to a permanent arrangement, it would be invested as originally contemplated. Would this meet with your approval?"

July 22d, defendant wrote Weaver that a great deal of progress had been made in the development of foods and that they were in the process of filing two patents; the first would cover the work done by Forbes and the second would revolutionize the entire food industry. If Weaver was interested, now was the time to get busy on this. He then stated: "I am about in the process of setting up a corporation and therefore would like to know who I am to take into this corporation. My advice, therefore, is that the money that you deposit, should be deposited to the American Trustee account under my name, Frank M. Jaques, in the town of Petaluma, Sonoma County, California, and be done immediately if you desire to get into this corporation. Regarding the guarantee of your money, if you are not entirely satisfied, I will give you my personal note which is backed by some one hundred and fifty thousand dollars ($150,000.00) at worth of myself, which will guarantee you at any time within a thirty (30) day notice to withdraw your money if you are not completely satisfied with the arrangement up to the time the corporation is formed. At the time the corporation is formed we will issue you stock at the rate of one hundred dollars ($100.00) a share. I would advise, by all means, that you get in touch with me as soon as possible, to put money up, as it is vital to our venture to increase our capital some over which we have at the present time. Also, I have a man at the present who desires to put two hundred thousand dollars ($200,000.00) to my account regarding this: But I am hesitant to allow any one man to put that amount of money in when I do not feel it is completely necessary. Therefore an immediate communication from you would be appreciated and your money immediately deposited for that reason." The last food patent "is 'way ahead of any food invention that has ever been placed on the market. Its cost of production is very low and is something *phenouminal.*"

July 25th, Weaver wrote defendant that it looked like he would get permanent entry early the next week and would be in Novato in the middle of August. "There is just one point that is bothering me and that is to have your assurance

that you still feel that I can make a definite working contribution, as you do not mention this in your letter. As I told you on the two occasions we have talked together, I do not feel in a position merely to make an inactive investment. I naturally do not expect any permanent or binding agreement, but would feel more at ease to have your confirmation that my capabilities—legal, literary, organizational—can be utilized at this time. I bring up this point now to avoid any possible misunderstanding later. Providing you do feel happy about utilizing my working capacities, I shall be happy to fall in with the suggestions in paragrah 3 of your letter about the deposit and guarantee of my $7,500.00 (seven thousand five hundred dollars). Immediately I have your reply to this point I shall go into San Diego and make the necessary arrangements to transfer this amount.'' July 31st, defendant replied by telegram: ''Received your letter of July 25 and confirming your capacity for legal literary organizational work. Will draw contract to your satisfaction and mine on your arrival. This will confirm your letter and guarantee your deposit.''

August 9th, Weaver wrote defendant that he was enclosing a cashier's check for $7,500 ''for eventual investment in the Honeycraft Corporation as set out in your letter to me of July 22nd.'' August 12th, defendant wrote Weaver acknowledging receipt of the check ''which I am depositing'' and stating that he had arranged for a furnished house and an unfurnished house for Weaver and asked him which he wanted. Defendant immediately deposited the check in his Business Opportunity Trust Account. Having obtained the entry permit, Weaver and his family came to California, arriving in Novato August 26th, and going to a home procured for them by defendant. Defendant was away but returned three or four days later.

Before relating what occurred on defendant's return it is necessary to backtrack. Harnden, as late as April 29th, had given defendant a favorable report concerning the Forbes processes, but thereafter ''he didn't seem to follow through what I had in mind'' so defendant employed one Juilly, a chemical engineer who was acquainted with Forbes to make a further investigation. As early as March, 1952, Juilly advised defendant against investing in a particular Forbes process which had been patented by another and which eventually became Atlas Powder Company property. However, Forbes from time to time produced new ideas and

processes and Juilly continued to investigate them, reporting progressively to defendant against investing in them even though the patent attorneys felt that there might be some novel products that might warrant application. August 3d or 4th Juilly reported to defendant against the Forbes processes and defendant advised Juilly that as a result of his report defendant had decided to cancel and pay off all obligations and forget his participation in the Forbes matter. (It will be noted that Weaver sent the $7,500 from Mexico on August 9th, receipt of which defendant acknowledged August 12th and which check he then cashed, placing it in his own trust account.)

When defendant returned to Novato a few days after Weaver had arrived there on August 26th, defendant told Weaver that he had terminated his agreement with Forbes and that the latter's processes were not good. Weaver did not ask for the return of his money nor did defendant tell him what he had done with it. Defendant testified that Weaver still thought something could be done with the Forbes processes so defendant arranged a meeting with Juilly as he thought Juilly could explain better than he could the inadvisability of going further with them. September 4th such meeting was had and Juilly convinced Weaver the Forbes processes were not worth investing in. Defendant and Juilly suggested that Weaver might be interested in investing in a soil conditioner that Juilly knew about but Weaver was not interested. Defendant then told Weaver about some real property at Corte Madera which he claimed to own (actually he only had an option to buy it) and for the development and sale of which defendant intended forming a corporation. Weaver testified that he assented in general to his $7,500 going into this corporation. Defendant denies this, stating that the Corte Madera property was discussed for the reason that Weaver was studying to take the real estate salesman's examination so that he could work for defendant and sell lots in this property. Weaver did become a real estate salesman and was employed by defendant for about two months at $100 per month, advance on commissions, although he actually sold no real estate. On September 13th defendant gave Weaver his promissory note for $7,500 payable one year after date without interest, and providing for attorney's fees in the event of default, saying it was by way of receipt until the proposed Corte Madera corporation had been set up. Defendant testified that when the Forbes deal fell through he offered to return Weaver's money. As to this Weaver

testified, "I don't recall Mr. Jaques having made that offer at that time," and when asked if defendant made the offer before September 13th Weaver said, "I don't think he did." Subsequently (apparently about 16 months later) the note was returned to defendant by Weaver in exchange for a new promissory note secured by a deed of trust on certain realty, the new note providing for payment of interest back to September 13th.

As to the Corte Madera property, Weaver told defendant he would be interested in investing only if there was a possibility of his being employed by the proposed corporation. Defendant told him he would be secretary. Weaver occupied a rent-free house supplied by defendant from August to December. On December 5, 1952, Weaver handed defendant a letter stating that he was giving up his position as salesman with defendant—"I prefer not to proceed further with the idea of investing the seven thousand five hundred dollars ($7,500.00) which you hold on my behalf in stock of the proposed Corte Madera Subdivision corporation" and asked that defendant "pick up the note I hold from you in the amount of seventy-five hundred dollars which evidences receipt by you of my money." In a letter written to Weaver by defendant February 13, 1953, defendant referred to the "$7,500.00 investment you made with me on which I gave you a note for, due September, 1953." Defendant told Weaver he would return $1,000 or $2,000 about Christmas, and the balance early in the year. "On that undertaking" Weaver left Novato. Defendant admitted he used Weaver's money in his business but could not recall when or for what. Weaver was paid no part of the $7,500, nor did he receive any stock of any kind therefor. Admittedly defendant never received any permission from the corporation commissioner to sell stock in any of the mentioned corporations, nor were they ever formed.

### COUNT 1—CORPORATE SECURITIES ACT

The evidence clearly shows that defendant offered to sell and Weaver agreed to buy $7,500 worth of stock in the proposed corporation to be called Forbescraft Company or Honeycraft Company or some similar name. The statement in defendant's letter to Weaver of July 22, 1952, stating "At the time the corporation is formed we will issue you stock at the rate of one hundred dollars ($100.00) per share," coupled with Weaver's letter to defendant of August 9th stating that he was sending the $7,500 "for eventual invest-

·ment in the Honeycraft Corporation as set out in your letter to me of July 22nd" and defendant's acceptance of the check and cashing it, are alone sufficient to show a "sale" of a "security" under the Corporate Securities Act, and a violation thereof, unless the fact that Weaver's purchase was contingent upon his being employed by the proposed corporation changes the legal effect.

Section 26104, Corporations Code, makes it a crime to "sell" "any security" without first having obtained a permit from the corporation commissioner.

Section 25009: " 'Sale' or 'sell' includes every disposition, or attempt to dispose, of a security or interest in a security for value. 'Sale' or 'sell' includes all of the following . . . : An offer to sell; an attempt to sell; a solicitation of a sale; an option of sale; a contract of sale; a taking of a subscription; . . ."

Section 25008 provides that " 'Security' includes . . . : (a) Any stock . . . investment contract, or beneficial interest in title to property, profits, or earnings. . . ."

While it is true that there was no stock in existence, it would be an unrealistic interpretation of the section to hold that no sale of stock could occur unless the stock actually existed. Under such an interpretation all one would have to do to avoid the necessity of obtaining a permit from the corporation commissioner would be to delay forming a corporation and issuing stock until such time as he had sold all the stock proposed to be issued. ▉ The purpose of the act is to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and the securities based thereon. (See *People* v. *Syde*, 37 Cal.2d 765 [235 P.2d 601]; *In re Hatch*, 10 Cal.2d 147 [73 P.2d 885].) There would not be much protection to the public if the corporation commissioner is given no opportunity to pass upon the merits of the proposed scheme until after the public's money has been obtained by the promoter. ▉ The contention that to constitute a crime in selling the proposed stock without a permit the corporation and the stock must be in existence, as the corporation might never be organized, has already been answered adversely to defendant in *People* v. *Oliver*, 102 Cal.App. 29 [282 P. 813]. In his opening brief defendant contends that at most defendant's letter of July 22d was "an agreement to reach an agreement." Even an agreement to reach an agreement to sell stock would be, at least, an "offer to sell" which is prohibited by section 25009.

"It has been the consistent policy of the state, as reflected in the various definitions of 'security,' to subject to regulation of all schemes for investment, regardless of the forms of procedure employed, which are designed to lead investors into enterprises where the earnings and profits of business or speculative ventures must come through the management, control, and operations of others and which, regardless of form, have the characteristics of operations by corporations, trusts or similar business structures." (*Moore* v. *Stella,* 52 Cal.App.2d 766, 778 [127 P.2d 300].)

We said in *People* v. *Beber,* 104 Cal.App.2d 359, 369 [231 P.2d 516]: ". . . when appropriately put in issue by the pleadings the receipt (in the absence of a permit) of the consideration specified in a contract for the sale of stock is a public offense under the act."

Even if it were to be considered that the agreement here did not constitute a sale of "stock" under the act, it was at the very least, within the meaning of the act, the sale of a "beneficial interest in title to . . . profits, or earnings" to be later evidenced by stock at $100 per share.

### EFFECT OF EMPLOYMENT AGREEMENT

It cannot be questioned that Weaver's subscription was subject to a contract of employment agreeable to himself being obtained. Defendant contends that this fact brings the case within the rule of *People* v. *Davenport,* 13 Cal.2d 681 [91 P.2d 892], *People* v. *Syde, supra,* 37 Cal.2d 765, and others, that "It is settled that the Corporate Securities Law was not intended to afford supervision and regulation of instruments which constitute agreements with persons who expect to reap a profit from their own services or other active participation in a business venture." (*People* v. *Syde, supra,* 37 Cal.2d at p. 768.) The facts of that case are easily distinguishable from the facts in our case. There the corporation of which the defendants were president and secretary-treasurer, respectively, entered into a contract with a minor child under which for payment of certain sums, the corporation undertook to train the child as an actress, produce a film with her, among others who signed similar contracts, in it, and to share a percentage of the gross receipts from the sale of the film among the cast in the film. A similar contract as to television sound film was also entered into. The court held that the Corporate Securities Law did not apply to contracts of this kind, as they were agreements

for the rendition of compensated services by both parties to the contracts and that there were no securities or other instruments mentioned in the Corporate Securities Law involved. *People* v. *Gould,* 37 Cal.2d 885 [235 P.2d 604], is to the same effect on similar facts, as *People* v. *Syde, supra.* In *Polizzi* v. *Porcaro,* 110 Cal.App.2d 395 [242 P.2d 949], the agreement was one "for a joint venture in which the adventurers would form a corporation." (P. 400.) In our case Weaver and defendant were not joint venturers, nor was Weaver to participate in forming the corporation.

Nor are the facts in *People* v. *Davenport, supra,* 13 Cal.2d 681, similar to those here. There the defendant agreed to sell to the purchaser certain building and loan certificates for a stipulated amount to be paid in monthly installments secured by insurance on the life of, and to be obtained and paid for by, the purchaser. The court held that such agreement was neither an "investment contract," "evidence of indebtedness," nor one of the "securities" mentioned in the Corporate Securities Act. In 25 Southern California Law Review 209, it is said: "The courts prefer to consider the facts of each case, to look through the form to the substance of the transaction, in determining whether the instrument involved is a security." ". . . it is clear that there has been an unmistakable trend in the California decisions to interpret the Act liberally and to sweep almost every conceivable sort of interest within the definition." (33 Cal. L.Rev. 357.)

█ "If the instrument of sale creates a present right to a present or a future participation in either the income, profits or assets of a business carried on for profit, it is a 'security' as defined in the Corporate Securities Act. Because the interest created will not return a profit until the performance of a future act, such as the sale of an interest in a patent, or the grant to a licensee of the right to use it, does not bring it without the provisions of this act." (*People* v. *Oliver, supra,* 102 Cal.App. 29, 36.)

There are no cases in California where the facts are similar to those here. █ A general rule may be deduced from the cases to the effect that if the enterprise is in the nature of a joint venture or if the investor is to have an active participation in its formation, or its operation is dependent for its success partly on the efforts of the particular investor, then, in any such event, the Corporate Securities Law does not apply.

In *State* v. *Gopher Tire & Rubber Co.* (1920), 146 Minn.

52 [177 N.W. 937], the investors were given certificates which entitled them to an interest in the profits of the company. Each investor was appointed agent of the company to "assist by word of mouth and in other ways in the sale of tires and tubes which" the company was to manufacture and was to receive a discount on all purchases he might make from the company. (P. 937.) The Minnesota Blue Sky Law, similarly to our Corporate Securities Law, prohibited sales of "stocks . . . investment contracts" without the necessary license. The court in holding that the certificates were investment contracts or securities said (p. 938): "To lay down a hard and fast rule by which to determine whether that which is offered to a prospective investor is such a security as may not be sold without a license would be to aid the unscrupulous in circumventing the law. It is better to determine in each instance whether a security is in fact of such a character as fairly to fall within the scope of the statute. . . . The placing of capital or laying out of money in a way intended to secure income or profit from its employment is an 'investment' as that word is commonly used and understood." The court refuted the contention that the certificates were contracts for the performance of services by agents or that the agreement by the investors to render services made the certificates any the less securities. In *State* v. *Bushard* (1925), 164 Minn. 455 [205 N.W. 370], an agreement was entered into between one Hines and the defendant as agent of a bus company in process of incorporation. This agreement stated that Hines had advanced $1,000 as part payment on a motorbus and given his note for the balance. This bus was to be operated over a certain route. Hines was to operate it, or render such other services for the company as might be agreed, and was to receive from the company a guaranteed wage, a ratable share in a portion of the net profits of the business of the company from the operation of all its buses, and the eventual return of his investment and stock to be paid out of the company's earnings and dividends. The company was to pay all further sums due on the bus and the maintenance and operating expenses thereof, and hold Hines harmless from all liability connected therewith. The court pointed out that Hines "invested with a view of making profit" (p. 370), was to participate in profits as the result of his investment, and eventually to get corporate stock. It then held that the contract was "an investment contract" for which a license was required under the Blue Sky Law.

■ In our case, the agreement was that Weaver was to receive stock and to work for the corporation as vice president or secretary. The Gopher Tire case (supra, 177 N.W. 937) indicates that where the corporation can operate just as well without the services of the one agreeing to buy stock, the agreement comes within the terms of the Blue Sky Law. (See 25 S.Cal.L.Rev., p. 210.)   Applying that test here, it appears that the proposed corporation when formed could operate without Weaver.   While there was some discussion of his helping in the advertising of the proposed corporation and in the selling of stock, his services were not indispensable. His participation either before or after incorporation was not to be the active participation which would make the enterprise a joint adventure, or would make the agreement any the less an "investment contract" or an agreement to buy corporate stock.

### Count 2—Grand Theft

The question of whether there is any substantial evidence that defendant intended to steal or embezzle Weaver's money is the most serious question in the case.   Plaintiff contends that the very moment defendant, with knowledge that because of Juilly's adverse reports he intended to go no further with the Forbes projects, received Weaver's money and failed immediately to return it, the intent to appropriate the money to his own use appears.

■ While the evidence shows some misrepresentation by defendant to Weaver concerning the Forbes processes there is no evidence that defendant intended to keep Weaver's money in the event the Forbes projects fell through.   It is true that as early as March Juilly advised defendant against investing in the particular process which had been patented by others, and which later belonged to Atlas.   But Forbes had a number of processes.   Harnden had reported favorably upon them.   Juilly testified that after he had advised defendant against the "Atlas" process defendant tried to employ him to investigate these other processes.   He first declined to do so but later agreed to do so.   Defendant paid him for these services up to August 4th.   Progressively as he made his tests he advised defendant not to invest any more money in Forbes.   The patent attorneys thought there might be "some novel products" and while Juilly was attempting to discourage defendant in the Forbes processes it was not until August 4th that he made his final report and then defendant became convinced that the Forbes matter must be dropped.   True, in

the meantime defendant was advising Weaver that the outlook on the Forbes processes was very favorable, the processes were even "revolutionary," that he would guarantee Weaver's investment by his personal note* "backed by some one hundred and fifty thousand dollars ($150,000.00) at worth of myself,"† that he had a man who wanted to put $200,000 into the venture.

Plaintiff contends that when defendant deposited Weaver's check in his own trust account he obtained Weaver's money by trick or device. There is no evidence of one essential ingredient of the crime of theft by fraud, trick or device, namely, the intent "to deprive the owner of his property wholly and permanently." (*People* v. *Pillsbury,* 59 Cal.App. 2d 107, 111 [138 P.2d 320].) In the Pillsbury case, the court pointed out that the defendant was "an unmitigated liar, telling a story with no foundation whatever in fact, for the purpose of getting possession of the automobile" (p. 111) he was accused of stealing, gained its possession by trick and device, and that two of the essentials of the crime were present, yet it held that the absence of the third essential, the intent above mentioned, prevented his acts from constituting the crime of larceny by fraud, trick or device. The defendant's avowed purpose there "in taking possession of the automobile was to make a sale of it and this he was authorized to do by the owner." (P. 112.) Here defendant's purpose was to hold the money for Weaver's return from Mexico and to persuade Weaver if he did not wish the immediate return of it on learning of the end of the Forbes project (it is significant that when Weaver learned this he did not ask for the return of his money *or even mention it*) or to persuade Weaver to invest in one of the projects in which defendant was interested. As in the Pillsbury case, defendant's procedure was satisfactory to the prosecuting witness.

On August 9th Weaver sent defendant a cashier's check of the Bank of America at San Diego. At the time defendant received that check (August 10th) defendant then knew that the corporation deal was off. On August 12th he wrote Weaver acknowledging receipt of the check, but said nothing about the status of the corporation, but stated, "I have much to

---

*Weaver testified that defendant did not give him a "receipt" but did give him a "note" and that he took it "since in the correspondence there had been reference to such a note being given me by way of my further protection pending final arrangements between us."

†At the trial he was only able to substantiate his real property as having a net worth of $39,000.

tell you on your arrival.'' He deposited the check in his own account. Undoubtedly, he should not have done so, but should, at least, have kept the check to return it to Weaver on his arrival, although in his letter to Weaver of July 22d he had suggested that the money should be deposited in his name as trustee, to which Weaver assented. However, the moment he saw Weaver on his arrival in Novato he told him the true situation.

His explanation of his failure to tell Weaver in his letter of acknowledgment of the end of the Forbes matter is a reasonable one. Weaver had had trouble in getting an entry permit, and had used the correspondence showing that he had a job in prospect in getting the permit. Defendant testified that he feared that the fact there was now no job in sight might interfere with Weaver's getting into the country.

When he told Weaver that the deal was off Weaver was satisfied to continue to leave the money in defendant's hands. The evidence clearly shows that Weaver wanted to invest his money through defendant and to go into business with defendant. He did so, in fact. There is not one iota of evidence that had he asked defendant for his money at this time he would not have received it. There is no evidence that up to this point defendant intended to keep Weaver's money. He did, of course, want Weaver to invest through him or in one of his proposed enterprises. Plaintiff conceded at argument that unless the theft took place before Weaver accepted defendant's promissory note there was no crime. We fail to see any evidence which would support a finding of theft at any time. Up to the time of the acceptance of the promissory note, defendant was holding Weaver's money in trust for him and Weaver was perfectly content to have him do so. Upon the giving of the note the trust relationship changed and a debtor-creditor relationship began.

Generally the question of a defendant's intent is solely one of fact for the jury, but as said in *People* v. *Pillsbury, supra,* 59 Cal.App.2d 107, 112: ''This is no doubt true where the evidence, with the possible implications therefrom, will, even though conflicting, reasonably admit of an inference of felonious intent. But the rule is the same here as on any other question of fact; where the evidence furnishes no rational support for an inference, on appeal the question becomes one of law for the appellate court, which may, in such case, declare the inference unsupported. (8 Cal.Jur. 593.)''

### 3. New Trial

■ Defendant contends that the trial judge did not properly review the evidence on the motion for new trial. He bases that contention on two statements of the judge during the trial and one on motion for new trial which defendant contends indicates that the judge paid no attention to the evidence as it came in. We have examined the statements and are satisfied they do not bear that interpretation. We see nothing wrong in a judge on a motion for new trial requesting that his memory be refreshed by a reading of a portion of the prosecuting witness' testimony. While we do not agree with an unfortunate remark of the judge which might bear the interpretation that he thought a judge was "simply acting as a referee" at the trial, we see nothing to indicate that the trial judge was ignorant of the evidence in the case nor that he acted merely as a referee, nor that in determining the motion for a new trial the judge did not give full and independent consideration to all the evidence in the case, even though we find that as to the second count the motion for new trial should have been granted.

The judgment on the first count and the order denying the motion for new trial thereon are affirmed. The judgment on the second count and the order denying the motion for new trial thereon are reversed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied January 3, 1956.