[Crim. Nos. 8297, 8298. Second Dist., Div. Two. May 6, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. OLIVER OREN CLARK, Defendant and Appellant.

Oliver Oren Clark, in pro. per., for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and S. Clark Moore, Deputy Attorney General, for Plaintiff and Respondent.

ASHBURN, J.—Two appeals are presented here upon a single reporter's transcript; one is taken from conviction of four counts of violation of section 26104, subdivision (a), Corporations Code,[1] and from order denying new trial (our

---

[1]Corporations Code section 26104: ''Every officer, agent, or employee of any company and every other person, who does any of the following

No. 2nd Crim. 8298]; the other from order revoking probation which had been granted in another case after plea of guilty of violation of said section 26104, subdivision (a), and from judgment rendered on February 1, 1962, in said cause (our No. 2nd Crim. 8297).

APPEAL No. 8298

Oliver Oren Clark, veteran lawyer and practitioner of the Los Angeles Bar, while on probation following a previous plea of guilty of violation of section 26104, subdivision (a), Corporations Code, conceived in collaboration with his co-defendant, Emil J. Ruberti, a plan of action which the trial judge at the conclusion of a nonjury trial characterized in several instances as a "very thinly veiled attempt to avoid the Corporate Securities Act." After careful examination of the record, including the testimony, exhibits and briefs, we are brought to the same conclusion.

Appellant Clark in varying forms advances the following argument. He and a group of associates formed a joint venture for the purpose of establishing and operating a chain of discount stores in Southern California and the Las Vegas area of Nevada; to that end and as a means of tax saving under the portion of the income tax law relating to small business corporations (26 U.S.C.A. § 1371 et seq.), appellant and others formed a Nevada corporation named Quality-Discounts, Inc., the articles of incorporation of which were filed on December 30, 1959. The plan was to limit the number of associates to 10 in order to comply with the statutory definition of a small business corporation; each associate was to contribute his personal services to the business through employment as a store manager and as a director and officer of the corporation; though each of them was to subscribe $10,000 to the venture and receive stock therefor, the certificates were but evidences of participation in a joint venture, no public offering being made.

The evidence credited by the trial judge refutes this argument in practically every particular. ■ In saying this we

acts is guilty of a public offense punishable by a fine not exceeding five thousand dollars, or by imprisonment in the state prison not exceeding five years or in a county jail not exceeding one year, or by both such fine and imprisonment;

"(a) Knowingly authorizes, directs, or aids in the issue or sale of, or issues or executes, or sells, or causes or assists in causing to be issued, executed, or sold, any security, in nonconformity with a permit of the commissioner then in effect authorizing such issue, or contrary to the provisions of this division, or of the Constitution of this State. . . ."

have in mind the rule stated in *People* v. *Alison,* 189 Cal.App. 2d 201, 205 [10 Cal.Rptr. 859], and in many other cases. *Alison* says: ''Before a judgment of conviction may be reversed on the ground of insufficiency of the evidence, it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. (*People* v. *Frankfort,* 114 Cal.App.2d 680, 689 [251 P.2d 401].) ▬ We must assume, in support of the judgment, the existence of every fact which the trial court could have reasonably deduced from the evidence and then determine whether the facts 'justify the inference of guilt.' (*People* v. *Deysher,* 2 Cal.2d 141, 149 [40 P.2d 259].) ▬ Also, 'a finding that the transaction in question was within the proscription of the statute will not be disturbed if there was substantial evidence to support it.' (*People* v. *Rankin,* 169 Cal.App.2d 150, 160 [337 P.2d 182].) ''

▬ Apparently the only persons who paid cash into the venture were the State's prosecution witnesses, Peter Montana, Herbert L. Jacobs, Joseph Mirabella and Richard K. Wall, together with Howard Esterson and an unnamed person who paid in $1,000. Though the procedure differed somewhat in each case, that of Montana is fairly typical.

He saw an advertisement in the Los Angeles Herald-Express which, by fair inference, read like the one seen by Mr. Mirabella in the Valley Advertiser, *viz.*: ''Associate Active—Terrific opportunity. Participate in expanding 3 major discount store operations with high percentage of return plus salary. Investment up to $5000 secured. Mr. Harry. Ci-48401.'' A telephone call elicited the Glendale address of the headquarters of appellant and Ruberti, 310 North Glendale Avenue in Glendale, California; a visit there proved ''Harry'' to be one Sliger, who put Montana in touch with appellant Clark and Ruberti. They told him they had formed a Nevada corporation for a tax purpose, among others; that they needed $50,000 and were looking for 10 associates at $5,000 each; that he, Montana, would be paid back with stocks and would have a job managing one store on a weekly salary. Montana said he would buy $10,000 worth and they said ''fine.'' ''I told them that I was buying the $10,000 shares and they were going to give me 10,000 in preferred and 5,000 in common on that there, and Ruberti and Oliver Clark told me that I was supposed to get a job out of this and be a manager in one of the stores. I accepted the job and, of course, there was a few changes to be made

in this document here that we made, before I signed it.''
Montana delivered his check dated March 30, 1960, payable
to Ruberti in the sum of $10,000; it has written on the back,
above Ruberti's endorsement, the words ''this check is for
$10,000 Preferred Stock.'' Ruberti handed the check to
Clark; it was endorsed and paid by the bank. Montana was
handed a promissory note for $10,000 dated March 26, 1960,
payable 30 days after date, ''Principal and interest payable in
Lawful Money of the United States at Glendale, Calif.—as
per contract,'' the last three words being in Clark's hand-
writing; the note was signed ''Emil J. Ruberti, Pres.'' A con-
tract signed by Ruberti and ''accepted'' by Montana was de-
livered at the same time. It is set forth in the footnote.[2]
This agreement was drawn by appellant Clark who, as appears,
was working in close cooperation with Ruberti. Clark handed
it to Montana, having interlined in his own writing the words,
''in a management capacity,'' and ''Salary payable in weekly

---

[2]''March 26, 1960. Mr. Peter Montana, 10011 Marnice Avenue, Tu-
junga, California. Dear Mr. Montana:

''Today I have received from you the sum of $10,000 as a personal loan
to me to be paid as hereinafter stated, and in evidence thereof I have
executed, of even date herewith, my personal Promissory Note payable to
you in said sum within thirty days after date hereof with interest
thereon at the rate of 4% per annum, unless otherwise paid as herein
provided, to-wit:

''*I agree to procure within said period, the issuance to you and to your
wife, Anna Montana, as Joint Tenants, of 10,000 shares of the authorized
preferred capital stock, of the par value of $1.00 per share, fully paid,
and 5,000 shares of the authorized common capital stock of no par value,
fully paid, of Quality-Discounts, Inc., a corporation, as of this date.*
[Italics added.]

''Said corporation is organized as a holding company for a chain of
discount stores, and will own a minimum of fifty percent of each store
in said chain. The membership in this holding company is limited to ten
associates of whom you will be one.

''Upon the issuance of said shares my Promissory Note to you in the
sum of $10,000 executed as of even date herewith as above stated is to be
cancelled by you, and returned to me.

''Concurrently therewith I will cause said Quality-Discounts, Inc. to
execute a contract, in writing, wherein and whereby you are employed
as of April 1, 1960, and thereafter as long as you may be able, and
choose, to perform the duties of said employment, in some capacity agree-
able to you in the merchandising operation controlled by said corporation,
in a management capacity, preferably at Glendale or in North Hollywood,
California, at a salary beginning April 1, 1960, of not less than $150.00
per week and which salary is to be increased reasonably as the nature and
quality of your services warrant. A suitable position, with opportunity of
advantageous advancement, for your son will be available as and when
desired by you and him, in said merchandising operation. Your employ-
ment at all times is to be in a position satisfactory to you. Salary payable
in weekly instalments.

installments,'' and ''vice president''; he had also inserted 150 in place of 100 as the weekly salary. The corporation had no permit to sell shares of stock nor did Clark or Ruberti have any permit.

A meeting of ''Associates'' was held in Las Vegas on March 30 or April 1, 1960. This was after Montana and Jacobs had bought and paid for their stock in Glendale. Directors of Quality-Discounts, Inc., were elected and a resolution was adopted authorizing issuance of corporate stock. On the train returning from Las Vegas to Los Angeles, certificates for 10,000 shares of preferred and 10,000 shares of common stock in Quality-Discounts, Inc., were issued to Montana and his wife and delivered to him; the blanks in it were filled in the handwriting of Clark who signed the same as secretary, with Ruberti signing as president of the corporation. Clark claims delivery was made in Nevada but none of the other witnesses knows whether it occurred in Nevada or California.

Mr. Jacobs went to the Glendale office pursuant to a newspaper advertisement he had seen, saw Sliger, then Clark and Ruberti. Having told of his own background, Clark said he would be a good associate; that they were looking under the Small Businessmen's Act for 10 associates to come into a venture of a discount chain. A few days later Jacobs and his wife told Clark and Ruberti they were willing to come in on the deal with $5,000. Ruberti said in Clark's presence that Jacobs was to be manager of a discount store in El Segundo ''with a salary and a full associate or partner—with the benefits coming from any money that was made over and above the salary.'' Clark wrote in longhand an agreement similar to the one given Montana. It contains this paragraph: ''I have received five thousand from you as a personal loan to be repaid within thirty days with interest at four per cent per annum, in accordance with the following: I agree to procure for you within said period 5000 preferred shares, and 2500 common shares, of the Quality-Discounts, Inc., fully

---

''In addition to the foregoing you are to be elected as a Director and vice president of said corporation, and you are to receive the benefits of insurance, and profit participation *in addition to your ownership of said common shares,* on the same basis as other employees of said corporation, which will be in accordance with the best standard of said practices now in vogue in merchandising business. [Italics added.]

Accepted:

*Peter Montana*

Peter Montana

Florida 2-2488.''

Sincerely yours,

*Emil J. Ruberti, Pres.*

Emil Ruberti.

paid. Said common shares are no par value, and said preferred shares are $1.00 par, and bears interest at 4% until retired.'' Ruberti signed it as ''Pres.'' and Jacobs wrote the word ''Accepted'' and signed his name below it. There was also a Ruberti promissory note for $5,000 with principal and interest payable ''as per contract of this date.'' Under date of April 1, 1960, certificates for 10,000 shares of preferred and 10,000 shares of common stock were issued in the names of Jacobs and wife as joint tenants. Each of them bears the endorsement: ''For Value Received, I hereby sell, assign and transfer unto Quality-Discounts, Inc. ten thousand Shares of the Capital Stock represented by the within Certificate, and do hereby irrevocably constitute and appoint Oliver O. Clark, secretary, to transfer the said Stock on the books of the within named Corporation with full power of substitution in the premises as security for the payment of my note of even date. Dated April 12, 1960. Herbert Jacobs. In presence of Oliver O. Clark.'' Apparently the blanks in the form were filled in Clark's handwriting. For some reason these certificates were cancelled.

On April 12, 1960, Mr. Jacobs gave a check for $5,000 payable to Quality-Discounts, Inc. bearing the notation ''Bal. in full for stock.'' It was endorsed and deposited by the corporation. New certificates for 10,000 shares of each class of stock were issued to the Jacobses on April 12, 1960.

Mr. Mirabella saw the advertisement in the Valley Advertiser which is quoted above. He went to the Glendale office where he was told by ''Harry,'' Jacobson, and another, ''roughly the idea of the stores, the corporation they were going to form, in which I will get stocks and eventually employment to the store, in the store.'' He also talked with appellant on another visit and told him, ''I don't know much about these stocks because I never bought any stocks in my life. So he explained me farther, he explained to me again, and he was very nice about it and telling me about the preferred stock and the common stocks.'' Clark also said he would get ''shares, stock,'' ''in the Quality-Discounts store'' for the two cashier's checks he delivered. One was for $1,500 made to his order and endorsed to Ruberti who in turn endorsed it. The other was for $3,500 and was endorsed in the same manner. He was given a $5,000 note and later received certificates for 5,000 shares of preferred and 2,500 shares of common stock in Quality-Discounts, Inc., dated April 22, 1960. Mr. Mirabella, by trade a carpenter, was to take care of carpentry

and display windows in stores, "in a few words, mainten-
ance." He asked Clark, "if I can have some paper, I can
read over and see what I get from this investment. And he
all the time say, 'I haven't got it with me. The next time
you come back I give it to you.' That's the reason I went
back so many times." He never received any such agreement
or writing and never worked in any of the stores. Of course,
he was not made a director or an officer. The following lan-
guage of *People* v. *Smith,* 180 Cal.App.2d 420, 424, 425 [4
Cal.Rptr. 282], fits Mr. Mirabella: "With respect to Zoll
(count I), Smith argues that he was a joint adventurer and
thus contributions made by him could not be sales of secur-
ities in any event. This argument is entirely specious. To
constitute a joint venture 'there must be a community of in-
terest in the enterprise, a sharing of profits and losses, and
joint participation in conduct of the business.' (*Lasry* v. *Led-
erman,* 147 Cal.App.2d 480, 485-486 [305 P.2d 633].) There
is no showing in this record of any facts which would justify
the conclusion that Zoll was a joint adventurer in Jet Air-
Age. He was a part-time employee and an investor on a small
scale. Although theoretically he would share in profits if
any there were, there is no evidence that he exercised any
degree of control of the business. His duties as an employee
were limited to those of machinist and 'general helper.' ''

 Mr. Wall read an advertisement in the Los Angeles
Times which took him to the Glendale office; "Mr. Clark out-
lined the organization of Quality-Discounts involving ten as-
sociates, each contributing $10,000.00 into the organization
and receiving shares of stock for their monies. . . . Each of the
associates would own an equal share of the business and have
an equal voice in the operation of the business. Responsibilities
of jobs and so forth was to be broken down in a manner to be
outlined in the future. We touched on the corporation itself.
It was told to me that the Quality-Discounts was a Nevada cor-
poration and legally formed and had issued stock already. He
was negotiating with several investors which at that time were
to bring in substantial amounts of money." Clark also told
him, "that previous associates had come into the association
with the distribution of preferred and common stocks on an
equal basis, one-for-one. He felt that since I was one of the
latest associates coming into the group, that the distribution of
stock to me should be on the basis of two-for-one, that is, two
shares of common to one share of preferred, which boiled down
to the fact that I would have half of the voting power that

the other associates would have. I did not agree to come into the organization under these circumstances; and after a subsequent meeting, I came back to Mr. Clark and Mr. Ruberti and they agreed to issue the full amount of stock to me as other associates. Mr. Wall delivered to Ruberti, who in turn handed to Clark, his check of May 2, 1960, for $10,000 payable to Ruberti and it was deposited to the credit of Quality-Discounts, Inc., but he never received any stock certificate until he issued same to himself just prior to leaving the company in the second week of June, signing same as president of the corporation. The said check of May 2d bore the notation on its face "Stock in Quality." Mr. Wall became manager of the Glendale store, as well as vice president and later president of the corporation.

He also testified: "Q. Mr. Wall, would you have gone to work for Quality-Discounts but for the opportunity to purchase stock in the organization? A. No. Q. You wouldn't have gone to work just for a salary without the stock ownership? A. No." In this connection Mr. Montana said: "Q. By Mr. Walton: Was it your expectation when you invested money in this venture that profits would materialize without any exertions on your part? A. Yes. Q. This was your expectation? A. Yes. I expected to make some money out of it. Q. Without any exertions on your part? A. Yes. . . . Q. By Mr. Walton: Was it your expectation, Mr. Montana, that any profits that you would realize or income would be in large measure attributable to your own exertions, your own activity as a member of this venture? A. No. I didn't know how much they was going to make out of it. Q. Whatever profits that might materialize? A. Whatever profits we were going to split between all the associates."

In all the talks had by Clark and Ruberti with those who invested in the project there was nothing said about a joint venture or sharing of profits and losses, nothing except the remark to Jacobs that he would be "a full associate or partner." Certainly that was nothing more than a proposal to form a partnership in the future, a nullity. (37 Cal.Jur.2d § 18, p. 556.) Reference to a partnership was not made in talking to any of the other investors, and they did not talk partnership or joint venture or sharing of profits or losses with each other. The only attempt to define the quoted remark for Jacobs' benefit was the statement that the objective was to get together a group of associates whose investments would be equal and who would have equal control of

the affairs of the business and that tax preferment would be gained through employing a small business corporation for which purpose Quality-Discounts, Inc., had been formed.

The statute (26 U.S.C.A. § 1371) prescribes that a small business corporation shall have not more than 10 shareholders and that if all of them consent (§ 1372), the corporation may elect that corporate income for income tax purposes shall be treated as set forth in footnote 3.[3] Clearly the benefit of this statute could be had by a corporation only—not a joint venture. There never was any mention of holding the shares of stock jointly, and the investors had no agreement express or implied, that they were to engage in an enterprise other than a corporate one. So the claim of joint venture disappears from the case.

■ There is a further valid reason for this conclusion. Interests in joint ventures are exempt from the Corporate Securities Act only if there is no public offering. (Corp. Code, § 25100, subd.(m).) In this instance each of the investors who testified was a stranger to defendant Clark and his associate; each came to the Glendale office because of interest aroused by a newspaper advertisement and there Clark and others induced him to buy stock. Nothing could be more clearly a public offering. (Cf. *Mary Pickford Co.* v. *Bayly Bros., Inc.,* 12 Cal.2d 501, 514 [86 P.2d 102]; *People* v. *Hoshor,* 92 Cal.App.2d 250, 255 [206 P.2d 882].) It is argued that there is no evidence of appellant's having knowledge of such advertisements but the testimony of Montana was that

---

[3]26 U.S.C.A. § 1373: *"Corporation undistributed taxable income taxed to shareholders.*

*"*(a) *General rule.*—The undistributed taxable income of an electing small business corporation for any taxable year shall be included in the gross income of the shareholders of such corporation in the manner and to the extent set forth in this section.

*"*(b) *Amount included in gross income.*—Each person who is a shareholder of an electing small business corporation on the last day of a taxable year of such corporation shall include in his gross income, for his taxable year in which or with which the taxable year of the corporation ends, the amount he would have received as a dividend, if on such last day there had been distributed pro rata to its shareholders by such corporation an amount equal to the corporation's undistributed taxable income for the corporation's taxable year. For purposes of this chapter, the amount so included shall be treated as an amount distributed as a dividend on the last day of the taxable year of the corporation.

*"*(c) *Undistributed taxable income defined.*—For purposes of this section, the term 'undistributed taxable income' means taxable income (computed as provided in subsection (d)) minus the amount of money distributed as dividends during the taxable year, to the extent that any such amount is a distribution out of earnings and profits of the taxable year as specified in section 316(a) (2). . . .*"*

he heard it mentioned between Ruberti and Clark in the Glendale office; also, that he heard Ruberti say in Clark's presence: "[T]hey were putting an ad in the paper to see if we can get some more associates, so we can raise our $100,000." At another time he testified: "They were advertising it in the paper." Moreover, the advertisements were authorized at the meeting held in Las Vegas.

The plan of Clark and Ruberti not only required a corporation as the money making entity (because of income tax law), but it also sought exemption from the Corporate Securities Act through application of the doctrine of *People* v. *Syde,* 37 Cal.2d 765 [235 P.2d 601], and similar holdings. The court there said, at page 768: "It is settled that the Corporate Securities Law was not intended to afford supervision and regulation of instruments which constitute agreements with persons who expect to reap a profit from their own services or other active participation in a business venture. Such contracts are clearly distinguished from instruments issued to persons who, for a consideration paid, stipulate for a right to share in the profits or proceeds of a business enterprise to be conducted by others; and the court will look through form to substance to discover whether in fact the transaction contemplates the conduct of a business enterprise by others than the purchasers, in the profits or proceeds of which the purchasers are to share." Hence, the Clark emphasis upon a group of associates having equal investments in the business and equal control over its management through personal participation in its affairs. Frequent efforts to apply the *Syde* doctrine to issuance of corporate stock have proved unsuccessful, as must this one. The case falls within our decision in *People* v. *Mills,* 162 Cal.App.2d 840 [328 P.2d 1049].

In that case Mills, a disbarred lawyer, had some Nevada mining properties which he desired to promote. He formed a Nevada corporation, negotiated in California for sale of its stock, not having obtained a permit from the Commissioner of Corporations, held a meeting in Nevada at which officers were elected and authorization given for transfer of the properties to the corporation and issuance of stock in exchange therefor. Meng and Shrader (investigators for the Los Angeles District Attorney) purported to be purchasers. Mills was convicted of violation of the Corporate Securities Act and on appeal sought refuge behind the *Syde* doctrine. At page 844 of 162 Cal.App.2d this court said: "Appellant's major contention is that there was no 'security' involved in

his transaction with Meng and Shrader because they were to become members of a four-member board of directors of the corporation, Clark Uranium & Copper Company, and were to be vice-president and treasurer of the corporation, respectively, and one of them was to cosign all checks with defendant Mills acting as president. Invoking *People* v. *Staver,* 115 Cal.App.2d 711 [252 P.2d 700], and *People* v. *Jaques,* 137 Cal.App.2d 823 [291 P.2d 124], appellant argues that any profit upon their investment could be reaped only through personal efforts of Meng and Shrader and hence the rule of cases such as *People* v. *Syde,* 37 Cal.2d 765, 768 [235 P.2d 601], *People* v. *Gould,* 37 Cal.2d 885 [235 P.2d 604], and *Austin* v. *Hallmark Oil Co.,* 21 Cal.2d 718, 727 [134 P.2d 777], becomes applicable and controlling." ▮ At page 849: "Under the California statute an offer or attempt to sell comes within the definition of sale (Corp. Code, § 25009), and a sale made without an appropriate permit constitutes a crime (§ 26104). (*People* v. *Mills, supra,* 148 Cal.App.2d 392, 407 [306 P.2d 1005]; *Ogier* v. *Pacific Oil & Gas Development Corp.,* 135 Cal.App.2d 776, 779-780 [288 P.2d 101].) It is said in the cited case of *People* v. *Jaques, supra,* 137 Cal.App.2d 823, 832: 'Even an agreement to reach an agreement to sell stock would be, at least, an "offer to sell" which is prohibited by section 25009.'

▮ "The evidence at bar discloses a palpable attempt at evasion of the California Corporate Securities Act. The offer to sell the stock was made and accepted in this state; the price was to be paid and the stock delivered here. The proposed meeting in Nevada was for the sole purpose of transferring the so-called lease to the corporation and having the stock issued there, delivered to Mills (the real seller) [footnote omitted] and by him brought to Los Angeles for delivery to the buyers. The mere fact of issuance of the stock in Nevada does not save the transaction from the stigma of calculated evasion or from the sanctions prescribed by the statute for violation of its terms. That such is the law is attested by [numerous citations]. In the first cited *Sears* case it is said: 'The Corporate Securities Act clearly prohibits a foreign corporation from soliciting in California a sale of stock of its own issue without first securing a permit, even though in good faith the issuance of the stock and transfer of title are to take place in a foreign state.' (*People* v. *Sears, supra,* 138 Cal.App.2d 773, 791 [292 P.2d 663].)

"The contention that the status of Meng and Shrader as corporate directors and officers precludes the application of the general rule cannot prevail. The point made by appellant is that the venture could not function without the active participation of Meng and Shrader because they were to be two of four directors, and all company checks were to be signed by one of them; hence without their consent no money could be spent and no board action taken. The rule that where 'the assignee [buyer] is to share in the conduct of the enterprise, the instrument representing an assignment of a fractional interest . . . is not a security within the act' (quoting *Austin* v. *Hallmark Oil Co., supra*, 21 Cal.2d 718, at 727), did not arise from any such corporate internal situation, nor was it intended to apply thereto. The doctrine grew out of the necessity of determining what is an investment contract or a certificate of interest or a participation in an unincorporated venture, such as a real estate subdivision, an oil well, a mine, or the like. [Citations.] To apply it to a sale of corporate stock would open a broad avenue for safe evasion of the statute in cases of small operations. It would be necessary only to make the buyers corporate officers and directors with a controlling vote and sales of the company stock could be made without a permit and with impunity. Many a rascal would relinquish control of a speculation for cash in hand. Such an interpretation of the law would permit most closed corporations to issue stock without consulting the Commissioner of Corporations and later to resell the same to members of the public.

"The initial 'Blue Sky' legislation in this State was the Investment Companies Act (Stats. 1913, ch. 353, p. 715) which confined its definition of security to 'stock, stock certificates, bonds, and other evidences of indebtedness, other than promissory notes not offered to the public by the maker thereof' (§ 2, subd. (b)). Note 13 on page 544 of 6A Cal. Jur. (§ 306), says: 'The defect in the original act of 1913 was that it applied only to the issuance and sale of stock by the corporation itself, not to anything but "stock" and not to resales of stock issued in other states by corporations thereof, and not to bonds, participation shares other than stocks, or to shares in unincorporated companies and trusts.' The law proved defective because of the many investment arrangements devised to defeat its ends. Accordingly, it was strengthened by including participations of various sorts in the definition of security. Speaking of the Corporate Securi-

ties Act, as passed in 1917 and amended in 1919, the Supreme Court said, in *In re Girard,* 186 Cal. 718, 723 [200 P. 593]: 'The provisions regarding companies, trusts, and trustees were inserted in the act for the evident purpose of preventing evasions such as would follow if the operation of the act was confined to corporations alone.' The task then devolved upon the courts to determine what is a 'security' (not what is a share of stock, the primary type of security), and in so doing to protect ordinary business transactions that are not within the evil at which the act is aimed (see *People* v. *Syde, supra,* 37 Cal.2d 765, 768; *People* v. *Rankin, supra,* 160 Cal.App.2d 93, 96 [325 P.2d 10]), and to prevent evasion of the statute on the other hand. It was this problem that gave rise to the line of cases typified by *People* v. *Steele, supra,* 2 Cal.App.2d 370, 374 [36 P.2d 40], and other cases above cited, cases prescribing the test of whether the investor expects his profits to flow from his own efforts or from those of others. None of said cases holds or intimates that a corporate structure can be set up which will exempt sale of the stock from control of the statute. We hold that appellant's attempt thus to evade the law cannot succeed; that sale of stock without a permit violates the statute regardless of the control of the shares of the issuing corporation. A sale of 75 per cent of the stock in one block is as much a violation of the act as a sale of 5 per cent. The actual rulings in *People* v. *Staver, supra,* 115 Cal.App.2d 711 and *People* v. *Jaques, supra,* 137 Cal.App.2d 823, relied upon by appellant, are not opposed to the views just expressed.'' At page 852: ''The *Jaques* case, *supra,* dealt with an arrangement whereby one Weaver advanced $7,500 to be used for purchase of stock in a corporation which was to be formed for prosecution of a certain venture, but upon condition that he have employment agreeable to himself. The court said that the facts showed a sale of security 'unless the fact that Weaver's purchase was contingent upon his being employed by the proposed corporation changes the legal effect.' (P. 832.) It was held that *People* v. *Syde, supra,* 37 Cal.2d 765, and *People* v. *Davenport, supra,* 13 Cal.2d 681 [91 P.2d 892], were not controlling. After discussing those cases the court said, at page 834: 'A general rule may be deduced from the cases to the effect that if the enterprise is in the nature of a joint venture or if the investor is to have an active participation in its formation, or its operation is dependent for its success partly on the efforts of the particular investor, then, in any such event, the Corporate Securi-

ties Law does not apply.' This statement is too broad, as appears from the court's reliance upon certain Minnesota cases reviewed at page 835, and from this concluding paragraph of the discussion: 'In our case, the agreement was that Weaver was to receive stock and to work for the corporation as vice president or secretary. The *Gopher Tire* case (*supra* [146 Minn. 52 (177 N.W. 937)]), indicates that where the corporation can operate just as well without the services of one agreeing to buy stock, the agreement comes within the terms of the Blue Sky Law. (See 25 So.Cal.L.Rev., p. 210.) Applying that test here, it appears that the proposed corporation when formed could operate without Weaver. While there was some discussion of his helping in the advertising of the proposed corporation and in the selling of stock, his services were not indispensable. His participation either before or after incorporation was not to be the active participation which would make the enterprise a joint adventure, or would make the agreement any the less an "investment contract" or an agreement to buy corporate stock.' This case was not passed upon by the Supreme Court and we consider that intimations in the opinion that agreed personal services of the buyer can immunize a sale of stock without a permit do not bind us. Certainly the ruling in the case, as distinguished from its general language, is not opposed to the holding at bar. We do not mean to say that a bona fide joint venture would violate the statute merely because of an expressed intention to incorporate in the future and then issue stock. (See *Polizzi* v. *Porcaro,* 110 Cal.App.2d 395, 399 [242 P.2d 949]; *Nicholl* v. *Ipsen,* 130 Cal.App.2d 452, 457-460 [278 P.2d 927].) That is not the situation before us.''

Anent this last observation, *Enos* v. *Picacho Gold Min. Co.,* 56 Cal.App.2d 765, 772 [133 P.2d 663], is pertinent: ''As suggested in *McSherry* v. *Market Corp.,* (1933) 129 Cal.App. 330, 333 [18 P.2d 776], cited by plaintiff, a corporation may be but an instrumentality to carry out a joint adventure, and hence the mere fact that a corporation is interposed as an operating agent between two parties who hold its shares does not prevent them from being joint adventurers. But, on the other hand, that mere fact does not make them joint adventurers. The elements of a joint adventure must be found in other matters.''

*People* v. *Alison, supra,* 189 Cal.App.2d 201, 205: ''The fact that the options were given in California, with the transfer of title to the stock taking place in Nevada pursuant to

arrangements made by defendant for a meeting in Nevada for the transfer of the money, is immaterial. The offer or attempt to sell took place in this state. The offense for which defendant was convicted therefore took place here.''

*People* v. *Jaques, supra,* 137 Cal.App.2d 823, 831, is in point. The court there said: ''The statement in defendant's letter to Weaver of July 22, 1952, stating 'At the time the corporation is formed we will issue you stock at the rate of one hundred dollars ($100.00) per share,' coupled with Weaver's letter to defendant of August 9th stating that he was sending the $7,500 'for eventual investment in the Honeycraft Corporation as set out in your letter to me of July 22nd' and defendant's acceptance of the check and cashing it, are alone sufficient to show a 'sale' of a 'security' under the Corporate Securities Act, and a violation thereof, unless the fact that Weaver's purchase was contingent upon his being employed by the proposed corporation changes the legal effect.'' At page 833: ''It cannot be questioned that Weaver's subscription was subject to a contract of employment agreeable to himself being obtained. Defendant contends that this fact brings the case within the rule of *People* v. *Davenport,* 13 Cal.2d 681 [91 P.2d 892], *People* v. *Syde, supra,* 37 Cal. 2d 765, and others, that 'It is settled that the Corporate Securities Law was not intended to afford supervision and regulation of instruments which constitute agreements with persons who expect to reap a profit from their own services or other active participation in a business venture.' (*People* v. *Syde, supra,* 37 Cal.2d at p. 768.) The facts of that case are easily distinguishable from the facts in our case. . . . The court held that the Corporate Securities Law did not apply to contracts of this kind, as they were agreements for the rendition of compensated services by both parties to the contracts and that there were no securities or other instruments mentioned in the Corporate Securities Law involved.'' At page 836: ''In our case, the agreement was that Weaver was to receive stock and to work for the corporation as vice president or secretary. The *Gopher Tire* case (*supra,* 146 Minn. 52 [177 N.W. 937]) indicates that where the corporation can operate just as well without the services of the one agreeing to buy stock, the agreement comes within the terms of the Blue Sky Law. (See 25 So.Cal.L.Rev. p. 210.) Applying that test here, it appears that the proposed corporation when formed could operate without Weaver. While there was some discussion of his helping in the advertising of the proposed

corporation and in the selling of stock, his services were not indispensable. His participation either before or after incorporation was not to be the active participation which would make the enterprise a joint adventure, or would make the agreement any the less an 'investment contract' or an agreement to buy corporate stock."

The business had a short life, not more than two months. None of the investors received any of his money back and those that were managers of stores collected only small amounts as salary. ■■ Of course, financial loss to the investor is not a necessary element of the crime (*People* v. *Woolson*, 181 Cal.App.2d 657, 672-673 [5 Cal.Rptr. 766]), but the evidence is clear that, without consideration of this factual element the statute was violated. The idea of a joint venture seems to have been an afterthought, but the effort to inject the *Syde* doctrine into a plain sale of shares of stock not covered by a permit can only be viewed as a "thinly veiled attempt to avoid the Corporate Securities Act," especially as it occurred almost two years after the decision in *People* v. *Mills*, *supra*, and while appellant was on probation following a plea of guilty of violation of the same section 26104, subdivision (a) of the Corporations Code.

Appeal No. 8297

■■ Defendant appeals from judgment of February 1, 1962, and order revoking probation on that date. Conceding in his brief that the order is not appealable (under *In re Bine*, 47 Cal.2d 814, 818 [306 P.2d 445]), appellant properly asserts it to be in the category of an intermediate order reviewable on appeal from the judgment (see also, *People* v. *Robinson*, 43 Cal.2d 143, 145 [271 P.2d 872]).

In this case defendant Clark was charged in eight counts with grand theft and in five with violation of section 26104, subdivision (a) Corporations Code. On January 21, 1957, he pleaded guilty to counts 2 and 6 (violation of § 26104, subd. (a) ), proceedings were suspended as to those counts, and he was granted probation on February 19, 1957, for a period of five years with the proviso that "Defendant must make restitution as determined by the Probation Officer to those persons who desire that their money be paid back and must not engage in any form of illegal activities." Other counts were dismissed.

A hearing upon violation of probation was transferred to the court of Judge Philip H. Richards (who had tried the case above discussed under our No. Crim. 8298). It was heard

on February 1, 1962, probation was revoked and defendant sentenced to imprisonment in the county jail for one year and payment of a fine of $3,000; "Sentences as to Counts 2 and 6 are ordered to run concurrently with each other and consecutively to the sentences in Case No. 243549, Counts 1, 2, 3 and 4."

It seems that persons having claims aggregating $5,500 indicated their desire to have the money repaid to them but it appeared at the hearing that no restitution had been made by appellant though the five-year period would expire in less than three weeks from the date of that hearing. Protestations of past inability, but probable ability to perform within the remaining time with the help of friends, were not accepted as reliable. In No. 8298 appellant testified that he had given numerous guarantees for Quality-Discounts, Inc., in March-June 1960, had advanced $7,000 for remodeling the Glendale store, $2,500 as a rent deposit with Security-First National Bank, $500 deposit with the utilities department of the City of Glendale and that he and his wife had guaranteed supplies purchased by the corporation to the extent of either $10,-000 or $15,000. He also testified: "Q. Mr. Clark, you gave these various guarantees to merchandise suppliers, the sign company and the Security First National Bank, the lessor of the Glendale store. Do you have a net worth sufficient to make good—to make these guarantees good, do they mean anything? A. I do—." (Though objection was sustained the answer was not stricken.) During the whole progress of the Quality-Discounts, Inc., venture nothing was paid in furtherance of appellant's probation requirement.

The fact that Judge Richards had found him guilty of four violations of the act in March, April, and May 1960 was enough, standing alone, to justify revocation of his probation in the previous case.

*People* v. *Robinson, supra,* 43 Cal.2d 143, 146: "The record reveals that at the time of revocation of defendant's probation, a hearing was had wherein it appeared that defendant had been found guilty of a conspiracy to violate section 337a of the Penal Code (committed October 24, 1952). The appeal from such judgment of conviction has this day been decided and the judgment has been affirmed. (*People* v. *Robinson,* Crim. No. 5580, *ante,* p. 132 [271 P.2d 865].) Manifestly, such conviction, though not then final pending appeal, was sufficient to warrant the trial court's conclusion that defendant was engaged in criminal practices in violation of the

terms of his probation, which was thereupon revoked. Under all the circumstances there is no basis for disturbing the judgment entered against defendant.'' To the same effect, see *People* v. *Ketchum,* 185 Cal.App.2d 620, 621 [8 Cal.Rptr. 610].

■ ''The court may revoke probation solely on the basis of the probation officer's report.'' (*In re Levi,* 39 Cal.2d 41, 44 [244 P.2d 403].) ■ It is apparent from the record at bar that the probation officer had reported adversely upon petitioner's desired continuance of probation. The report is not before us and therefore a presumption arises in favor of the court's ruling. The judge's remark which appellant seeks to capitalize, ''I have not paid any attention to the probation reports''—was made prior to his granting a three weeks' continuance of the probation hearing and has no pertinence to the question now before us. There is nothing to indicate that Judge Richards was not fully advised when he made his ruling and sentenced defendant; on the contrary the judge made this statement immediately before revoking probation: ''Let the record show the Court has read and considered the report of the probation officer in Case Number 243549 which recommends the denial of probation.''

Appellant was not harshly or unfairly dealt with and we find no basis for reversal in either case.

Judgment in No. 8298 is affirmed; appeal from order denying new trial is dismissed.

Judgment in No. 8297 is affirmed; appeal from order revoking probation is dismissed.

Fox, P. J., and Herndon, J., concurred.

A petition for a rehearing was denied June 3, 1963, and appellant's petition for a hearing by the Supreme Court was denied July 3, 1963.